**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x

| | | |
|---|---|---|
| WILMINGTON TRUST NATIONAL ASSOCIATION AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF BANK 2018-BNK14, COMMERCIAL MORTGAGE SERIES 2018-BNK14, by and through its Special Servicer Rialto Capital Advisors, LLC, | : : : : : : : | Case No.: 1:22-cv-06743 |
| | : | |
| Plaintiff, | : : | **COMPLAINT FOR BREACH OF GUARANTY** |
| v. | : : | |
| EDWARD BUSHOR and STUART L. MILLER, | : : : | |
| Defendants. | : | |

------------------------------------------------------------x

Plaintiff WILMINGTON TRUST NATIONAL ASSOCIATION AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF BANK 2018-BNK14, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2018-BNK14 ("**Plaintiff**" or "**Lender**"), by and through its Special Servicer Rialto Capital Advisors, LLC ("**Rialto**"), for its Complaint for Breach of Guaranty against Edward Bushor and Stuart L. Miller, alleges as follows:

## PARTIES

1.     Plaintiff is and was, at all times relevant, a New York common law trust for which Wilmington Trust National Association is the Trustee ("**Wilmington Trust**"). Wilmington Trust is a national banking association, having its principal office located in Delaware.

2.     Defendant Edward Bushor ("**Bushor**") is an individual having an address at 625 Hanale Place, Kailua, Hawaii 96734.

3.     Upon information and belief, Mr. Bushor is the CEO of Tower Development, Inc. ("**Tower Development**").

4.      Defendant Stuart L. Miller ("**Miller**" and together with Bushor, the "**Guarantors**") is an individual having an address at 35-229 Kihalani Homestead Road, Laupahoehoe, Hawaii 96764.

5.      Upon information and belief, Mr. Miller is the President of Tower Development.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) in that this action is between citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

7.      Plaintiff is a national banking association and, pursuant to 28 U.S.C. § 1348, is a citizen and resident of the State of Delaware.

8.      Defendant Bushor is a natural person and is a citizen and resident of the State of Hawaii.

9.       Defendant Miller is a natural person and is a citizen and resident of the State of Hawaii.

10.     This Court has personal jurisdiction over the Defendants because they each irrevocably submitted in writing to the jurisdiction of this Court.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because each of the Defendants irrevocably (a) waived any objection to the laying of venue in this Court and (b) waived any claim that an action brought in this Court has been brought in an inconvenient forum.

## PRELIMINARY STATEMENT

12.     This case involves the repeated and systematic efforts by the owners of a hotel to misappropriate more than $1.3 million in rent and revenue from the property.  The actions being complained of were done to the detriment of Plaintiff, as lender, and in direct violation of governing loan documents, all for the benefit of insiders and affiliates.  Indeed, during a national pandemic when vendors, suppliers, creditors and employees of the hotel were receiving reduced or no payments, the owners of the hotel and their affiliates were (i) diverting rent from the hotel's restaurant and gift shop and (ii) paying themselves exorbitant fees from the property's operating revenue.

13.     Although the full extent of the ownership's greed is not known at this point, the recent appointment of a Receiver to oversee the property's operations has revealed the following with respect to the hotel restaurant:

a.     Just a year after the $50 million loan was made and in complete disregard of an existing space lease, the ownership agreed to shift control of the hotel restaurant to an affiliate and to restructure the terms of the "lease" -- all without the approval of the lender.  The purported structure of the new deal calls for a split of the operating profit -- 51% to the hotel and 49% to the restaurant.  The 51% due to the hotel was characterized as "rent."

b.     Rather than simply include the 51% "rent" on the hotel's financial statements as additional income, in what appears to be an effort to hide the fact that this new deal had been struck, the entire operating detail (revenue and expenses) for the restaurant has inexplicably been included in the hotel financial statements that were provided to the lender.

c.     Buried within the financial detail of the restaurant operations is the fact that the new restaurant deal also allows for an affiliate to receive a 3.25% management fee and an additional "consulting fee" in the amount of $10,471.20 per month.  Each of those "costs" are

factored into the expenses for operating the restaurant thereby reducing the operating profit, such that these monthly payments to affiliates serve to reduce what is supposed to be the "rent" paid to the hotel.

> d. Despite this elaborate construct, *none of the "rent" from the restaurant has been put in the hotel's operating account* or used for the operation of the hotel property in over two years.  Indeed, it appears that there is in excess of $341,372.03 in missing "rent."

14. The diversion of rents did not stop with the restaurant or when the lender began trapping the property's cash in the Fall of 2021.  Lender is of the belief that the gift shop is leased to an affiliate of the hotel's ownership and that when the gift shop ceased making the required monthly rental payments in 2020, the hotel was instructed not to pursue any collection efforts.  Recently, when the gift shop operator did finally deliver a check to the hotel for over $18,000 in past due rent, rather than endorse the check over to the property manager, remit the funds to the lender or place the funds in the property's operating account, ownership arranged to have the check picked up from the hotel.

15. Not only are funds being funneled away from the property and directly to insiders and affiliates, an audit of the hotel's books and records revealed that revenue from the property has been used to make more than $430,000 worth of improper payments to affiliated companies since 2020.

16. The full nature and extent of the abuses perpetrated upon the rents and revenues of the property by the owner's affiliates has only begun to come to light.

17. Although it appears that Mr. Bushor and/or Mr. Miller were the architects behind the various schemes used to misappropriate these funds, their actual knowledge or involvement is irrelevant because they executed a loan guaranty that renders them jointly and severally liable for each dollar that has been diverted, misappropriated and/or misapplied.

BADOCS/56090659

## STATEMENT OF FACTS

**The Loan**

18.     Pursuant to a Loan Agreement dated as of August 31, 2018 (the "**Loan Agreement**"), between WHR LLC (the "**Borrower**"), on the one hand, and Wells Fargo Bank, National Association ("**Original Lender**"), on the other hand, Original Lender agreed to make a loan to the Borrower in the original principal amount of $50,000,000.00 (the "**Loan**"), subject to the terms and conditions of the Loan Agreement.  A true and exact copy of the Loan Agreement is attached hereto as **Exhibit A**.

19.     The Loan is evidenced by a Promissory Note in the amount of $50,000,000.00 (the "**Note**").  A true and exact copy of the Note is attached hereto as **Exhibit B**.

20.     The Note is secured by a Leasehold Mortgage, Assignment of Leases And Rents, Security Agreement and Fixture Filing (the "**Mortgage**") on certain nonresidential real property commonly known as the Grand Naniloa Hotel Hilo – a DoubleTree by Hilton and located at 93 Banyan Drive and 1713 Kamehameha Avenue in Hilo, Hawaii, identified by Tax Map Key Nos. (3) 2-1-001: 012 and (3) 2-1-005: 013,016, 017, 032, 046 & 027 (all as more particularly described in the Mortgage and other loan documents, the "**Property**").

21.     In connection with the Loan, the Defendants executed a Guaranty of Recourse Obligations dated August 31, 2018 (the "**Guaranty**").  A true and exact copy of the Guaranty is attached as **Exhibit C**.  The Loan Agreement, the Note, the Mortgage, the Guaranty and all related documents are collectively referred to hereinafter as the "**Loan Documents**."

22.     By virtue of an Allonge (the "**Allonge**"), an Assignment of Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing effective as of September 27, 2018 (the "**Mortgage Assignment**") and a General Assignment effective as of September 27, 2018, (the "**General Assignment**"), Original Lender assigned all of its right, title

and interest in Note and the Loan Documents to the Lender.  A copy of the Allonge is included with Note attached **Exhibit B**.  A copy of the General Assignment is attached as **Exhibit D**.

**The Defaults**

23.     Article 2 of the Note, Section 7.1 of the Mortgage, and Section 10.1 of the Loan Agreement provide that an Event of Default occurs if any portion of the monthly debt service or required reserve funds are not paid when due.

24.     Pursuant to the Loan Agreement, the Borrower is obligated to pay monthly installments of principal and interest, together with required reserve payments, on the eleventh (11th) day of each calendar month.

25.     The Borrower admits that it failed to comply with the terms of the Loan Documents and was in default thereunder by virtue of, among other things, its failure to pay the monthly installments of principal and interest beginning in April of 2020 and continuing each month thereafter (the "**Monetary Defaults**").

26.     By reason of said Monetary Defaults and pursuant to the provisions of the Loan Documents, by letter dated July 23, 2021, Borrower was given written notice that (i) an Event of Default existed under the Loan Documents as a result of Borrower's failure to pay the monthly debt service payment due on April 11, 2020 and each month thereafter; and (ii) the Lender accelerated the maturity date of the Loan and demanded that the Borrower pay the Loan in full (including, without limitation, accrued interest calculated at the "Default Rate," as such term is defined in the Loan Agreement).  A true and exact copy of the July 23, 2021 Acceleration Letter is attached hereto as **Exhibit E**.

27.     In addition to the Monetary Defaults, as disclosed on financial reports provided by the Borrower to Plaintiff, the Borrower was also in violation of Section 5.1 of the Loan Agreement as a result of entering into the following unauthorized debt obligations without

-6-

Lender knowledge and consent: (i) $4 million in member loans and advances; (ii) a Paycheck Protection Program loan in the amount of $1,525,790 on May 4, 2020; (iii) a Paycheck Protection Program loan in the amount of $1,956,066 on February 26, 2021; and (iv) an Economic Injury Disaster Loan in the amount of $159,900 in July of 2020 (collectively, the "**Non-Monetary Defaults**" and together with the Monetary Defaults, the "**Events of Default**").

28.     As a result of the foregoing Events of Default and pursuant to the terms of the Loan Documents, the Lender (i) began trapping the Property's revenue in the Fall of 2021; (ii) filed a foreclosure complaint on December 6, 2021; and (iii) sought and obtained the appointment of a receiver for the Property on June 3, 2022.

29.     By letter dated January 12, 2022, Hilton issued a default and termination notice based on the existence of more than $800,000 in past due amounts dating back to November of 2020, which were due and owing under the terms of that certain Franchise Agreement effective as of March 12, 2015.

30.     After the Loan was accelerated, the Borrower made partial payments on September 13th, October 8th, November 9th and December 9th of 2021, which totaled $1,635,842.04 in the aggregate.

31.     As of May 31, 2022, the unpaid principal balance of the Loan was $48,917,177.03.   Interest (including default interest), late charges, servicing and administrative fees, expenses, attorneys' fees and costs continue to accrue under the Loan Documents.

32.     Borrower has failed to pay the Loan in full and remains in default under the terms of the Loan Documents.

**<u>The Audit</u>**

33.     By letter dated January 20, 2022, the Lender notified the Borrower that it had engaged FTI Consulting, Inc. ("**FTI**") to conduct a review and audit of the Borrower's financial

BADOCS/56090659

affairs.

34.    FTI's review and audit of the Borrower's books and records confirmed the existence of the Events of Default, and also uncovered significant self-dealing between Borrower and Borrower affiliates, at the direction and control of Mr. Bushor, during a time when the Loan was in default, no payments were being made to the Lender and third-party creditors, including Hilton Hotels, were going unpaid.

35.    During 2020 and 2021, Borrower paid Borrower-affiliated entities more than $430,000.

36.    The following chart shows a summary of funds that were disbursed to Borrower-affiliated entities, including Tower Development, Tower Commercial LLC ("**Tower Commercial**"), Tower Construction Hawaii, Inc. ("**Tower Construction**") and MR Hawaii LLC ("**MR Hawaii**"), in calendar years 2020 and 2021:

| Borrower-Affiliated Entity | 2020 | 2021 | Total |
|---|---|---|---|
| Tower Development | $74,648.40 | $183,789.20 | $258,437.60 |
| Tower Commercial | $0.00 | $72,918.42 | $72,918.42 |
| Tower Construction | $22,676.16 | $0.00 | $22,676.16 |
| MR Hawaii | $39,079.12 | $37,277.72 | $76,356.84 |
| TOTAL | $136,403.68 | $293,985.34 | $430,389.02 |

37.    Of the funds disbursed to Tower Development in 2020 and 2021, approximately $225,674.00 was for "asset management services" based upon a rate of $10,471.20 per month.

38.    In accordance with Section 6.15.1.3 of the Amended and Restated Operating Agreement of WHR LLC dated as of August 28, 2018 (the "**Operating Agreement**"), the Asset Management Services Fee "shall only be paid [to Tower Development] to the extent that there

exists excess cash flow after the payment of the monthly debt service and any additional obligations under the loan."

39.     The payments to Tower Development in 2020 and 2021 were done in violation of Section 6.15.1.3 of the Borrower's Operating Agreement because monthly debt service payments were not being made to Lender beginning in April of 2020.

40.     Of the funds paid to MR Hawaii in 2020 and 2021, $49,795.47 was for unspecified "project management fees."

41.     The 2021 distribution to Tower Commercial of $72,918.42 was characterized as "PPP Loan Origination" fees.

42.     According to Section 6.15.1.5 of the Operating Agreement, Tower Commercial is a licensed Hawaii real estate brokerage company, designated to market and oversee a sale of the Property in exchange for compensation based on the sales price.

**The Affiliate Restaurant Lease**

43.     Pursuant to that certain Hotel Restaurant Lease dated as of April 13, 2018 (the "**Restaurant Lease**"), Borrower leased the Hula Hulas Restaurant at the Property (the "**Restaurant**") to HH Hilo LLC, an affiliate of Borrower.

44.     In the Fall of 2019, without notice to or approval from the Lender, another borrower affiliate, Chad Yang, the Director of Food & Beverage for Tower Development, took over as the operator of the Restaurant and, in connection therewith, Mr. Bushor reported to the property manager that new arrangement with Mr. Yang involved an agreed upon split of profits whereby Borrower was to receive 51% as its "rent" and the Restaurant and/or Mr. Yang's operating company, CCY Management, was to receive 49%.

45.     Mr. Bushor failed to disclose, however, that under the terms of his new deal, Mr. Yang and/or CCY Management would also receive a 3.25% management fee and an additional

BADOCS/56090659

"consulting fee" in the amount of $10,471.20 per month, each of which would be included in the expenses of the Restaurant prior to the calculation of the split of profits among the Borrower and the Restaurant.

46.     As part of the agreement that Borrower receive 51% of the Restaurant profits, Borrower is responsible for supplying all of the utilities and major facilities to the Restaurant.

47.     In addition, based upon information and belief, Borrower holds the liquor license upon which the Restaurant relies to serve alcohol.

48.     According to Mr. Bushor, the rent due Borrower from the Restaurant was not determined on a monthly basis, rather a reconciliation was done twice in each calendar year, on June 30 and December 30.

49.     As of September 22, 2020, Mr. Bushor reported that Borrower had received over $170,000 of rent in ten (10) months based on the reconfigured arrangement with Mr. Yang, which averaged out to be approximately $17,000 per month as "rent" for the restaurant space.

50.     Upon information and belief, since 2020, the bookkeeper for the Restaurant sends the Restaurant's financial statements, including revenue, expenses and gross operating profit, to Borrower's accountant and, once approved by Mr. Yang and Mr. Bushor, Borrower's accountant sends an entry that summarizes the activity at the Restaurant to Evolution Hospitality (the "**Property Manager**") for inclusion in Borrower's consolidated P&L statements.

51.     Borrower's P&L statements, which were provided to the Lender, did not reveal the 49% allocation to the restaurant, the 3.25% management fee or the $10,471.20 monthly consulting fee that were being paid to Mr. Yang and/or CCY Management.

52.     Despite the fact the Restaurant has operated at a profit since 2020 and financial reporting for the Restaurant was being included on Borrower's P&L statements, ***no rent from the Restaurant was actually deposited into the Property's operating account since 2020***.

53.     Upon information and belief, all revenue from the Restaurant was deposited into one or more accounts that were in the name of Borrower's affiliate, HH Hilo LLC, and thereafter disbursed to Mr. Yang's company or Borrower affiliates controlled by Mr. Busher, including Tower Development, Tower Construction and MR Hawaii.

**The Gift Shop Lease**

54.     The gift shop at the Property, Kapohokine (the "**Gift Shop**"), is leased to Hawaii Performance Partners LLC pursuant to the terms of that certain Hotel Retail Lease dated February 1, 2016.

55.     The owners or operators of the Gift Shop are, on information and belief, affiliated with the Borrower as minority investors.

56.     The current base rent for the Gift Shop is $3,517.50 per month, plus additional rent based on a percentage of store sales, made market sales and rental/tours sales.

57.     Prior to March of 2020, the Gift Shop made payments to Borrower, which were deposited into the Property's operating account.

58.     During the COVID pandemic in 2020, the Gift Shop ceased paying rent to Borrower, and did not make any rent payments in 2021.

59.     Upon information and belief, when the Gift Shop stopped making rent payments to the hotel, the Property Manager was instructed not to pursue any collection efforts.

60.     Upon information and belief, in May of 2022, the Gift Shop issued a check in the name of the Borrower for $18,933.80, which covered the rent from February of 2022 through May of 2022 (the "**May Rent Check**").

61.     Upon information and belief, the May Rent Check was not deposited into the Property's operating account and was, instead, picked up from the hotel by Borrower at Mr. Bushor's direction.

**The Guaranty**

62.     Pursuant to Paragraphs 1, 2 and 4 of the Guaranty, the Lender has the right to look to the Guarantors for the prompt and unconditional payment of the recourse obligations and liabilities of the Borrower that arise under Article 13 of the Loan Agreement (collectively, the "**Guaranteed Obligations**").

63.     Section 13.1(a) of the Loan Agreement provides that the Borrower shall be personally liable "to the extent of any Losses incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with any of the following:

>                   *        *        *
> (i) fraud or intentional misrepresentation or any failure to disclose a material fact by Borrower, any SPE Component Entity, Guarantor, Sponsor, or any Borrower Party in connection with the Loan;
>
>                   *        *        *
>
> (iv) the misapplication, misappropriation or conversion by Borrower of . . . any Rents . . .
>
>                   *        *        *
>
> (viii) any fees or commissions paid by Borrower after the occurrence of any Event of Default to Guarantor, Sponsor and/or any Affiliate of Borrower, Guarantor and/or Sponsor in violation of the terms of the Note, this Agreement, the Security Instrument or the other Loan Documents;
>
>                   *        *        *
>
> (xiv) any violation or breach of any representation, warranty or covenant contained in Article 5 hereof, to the extent that same does not result in substantive consolidation of the assets of Borrower any SPE Component Entity with the assets of any other Person; . . .."

64.     Section 1.1 of the Loan Agreement defines "Affiliate" to mean "as to any Person, any other Person that, directly or indirectly, owns more than twenty percent (20%) of, is in

Control of, is Controlled by or is under common ownership or Control with such Person or is a director or officer of such Person or of an Affiliate of such Person."

65.     Section 1.1 of the Loan Agreement defines "Guarantor" and "Sponsor" to mean Mr. Bushor and Mr. Miller.

66.     Section 1.1 of the Loan Agreement defines "Major Lease" to include the Restaurant Lease.

67.     Section 1.1(h) of the Mortgage defines Rents to include "all rents, additional rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties . . . income, receivables, receipts, revenues, deposits . . ., accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Property . . .."

68.     Section 4.14(b) of the Loan Agreement prohibits the Borrower from amending or modifying a Major Lease without prior Lender approval.

69.     Section 4.14(d) of the Loan Agreement prohibits the Borrower from terminating a Major Lease without prior Lender approval.

70.     Section 4.25(g) of the Loan Agreement provides that "Borrower shall not, without Lender's prior consent . . . enter into transactions with any Affiliate, including without limitation, . . . the rendering or receipt of services or the purchase or sale of inventory, except any such transaction in the ordinary course of business of Borrower and only so long as the monetary or business consideration arising therefrom would be substantially as advantageous to Borrower as the monetary or business consideration that would obtain in a comparable transaction with a person or entity not an affiliate of Borrower."

BADOCS/56090659

71.     Article 5 of the Loan Agreement contains the Single Purpose Entity/Separateness covenants of the Borrower.  Specifically, Section 5.1(a) of the Loan Agreement provides that Borrower has not and will not:

> (iv)  fail to observe all organizational formalities . . . or fail to comply in all material respects with the provision of its organizational documents;

> *       *       *

> (vii)   incur any Indebtedness, secured or unsecured, direct or contingent . . .;

> *       *       *

> (viii)  fail to maintain all of its books, records, financial statements and bank accounts separate from those of its affiliates and any constituent party.

> *       *       *

> (ix)  enter into any contract or agreement with any general partner, member, shareholder, principal or affiliate, except upon terms and conditions that are commercially reasonable and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties (other than capital contributions and distributions or dividends permitted under its organizational documents); . . .

72.     Paragraph 6 of the Guaranty renders the Guarantors personally liable for all costs, fees and expenses, including attorneys' fees, incurred by the Lender in connection with the collection of the Guaranteed Obligations or the enforcement of the Guaranty.

73.     Pursuant to Paragraph 8 of the Guaranty, the Guarantor waived all defenses including "presentment, demand, protest or notice of any kind . . ." such that the Guaranteed Obligations are deemed immediately due and payable by Guarantor and Lender is entitled to bring suit to collect those amounts from Guarantor.

BADOCS/56090659

74.    All conditions precedent to the filing of this Complaint have been satisfied or waived.

**COUNT I**
**(Breach of Guaranty – Misappropriation of Rents)**

75.    The Lender repeats the allegations contained in paragraphs 1 through 74 above, as if fully set forth herein.

76.    The Guaranty is a valid and enforceable contract, which was executed by Guarantors in favor of Lender.

77.    Under paragraph 1 of the Guaranty, the Guarantors "jointly and severally . . . absolutely and unconditionally guarantee to Lender the prompt and unconditional payment of the Guaranteed Obligations . . .."

78.    The Guaranty defines "Guaranteed Obligations" to include "all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Article 13 of the Loan Agreement."

79.    Section 13.1(a)(iv) of the Loan Agreement imposes liability on the Guarantors for the misappropriation or misapplication by the Borrower of any Rents from the Property.

80.    Based on the financial statements of HH Hilo LLC that were reviewed by FTI, the amount of rent due to the Borrower, based on a 51% profit split reconciled at year end 2020, totaled $49,937.91, while the Restaurant was to receive $47,979.56.

81.    Based on the financial statements of HH Hilo LLC that were reviewed by FTI, the amount of rent due to the Borrower, based on a 51% profit split reconciled at year end 2021, totaled $291,434.12, while the Restaurant was to receive $280,005.33.

82.    The Restaurant Lease is a Major Lease requiring the prior approval of the Lender for any amendment, modification or termination.

-15-

83.    The Lender was not aware of and did not approve any change or modification of the Restaurant Lease terms, or any termination thereof.

84.    Since 2020, the Rent from the Restaurant has not been deposited into the Property's operating account or otherwise utilized for the operation of the hotel.

85.    Based on the banking records reviewed by FTI, revenue from the Restaurant was deposited into an account maintained and controlled by Borrower's affiliate, HH Hilo LLC, and thereafter disbursed to Mr. Yang's company and other Borrower affiliates, including Tower Development, Tower Commercial, Tower Construction and MR Hawaii.

86.    Based on the financial information provided to FTI, the Rent from the Restaurant totals $669,356.92.  That number is, however, understated because it reflects the payment in the aggregate amount of $249,563.60 to CCY Management in 2020 and 2021 for "consulting fees" that were agreed to in violation of Sections 4.14(d), 4.25(g) and 5.1(a)(ix) of the Loan Agreement.

87.    By entering into a new or amended Restaurant Lease without the approval of the Lender, the Borrower has diverted funds from the operation of the Property.

88.    In total, since 2020, Borrower has been deprived of Rent from the Restaurant in the amount of not less than $918,920.52 (the "**Diverted Restaurant Rent**").

89.    Historically, the Rent from the Gift Shop has been deposited into the Property's operating account.

90.    Rather than place the May Rent Check from the Gift Shop into the Property operating account or turn those funds over to the Property Manager, the Lender or the subsequently appointed receiver, Borrower misappropriated that rent at the direction of Mr. Bushor for its own benefit.

91.     The misappropriated rent associated with the May Rent Check totaled $18,933.80 (the "**Diverted Gift Shop Rent**").

92.     Pursuant to Paragraphs 1 and 2 of the Guaranty, the Lender has the right to look to the Guarantors for the payment of the obligations and liabilities of the Borrower that arose as a result of Borrower's misappropriation of rents from the Restaurant and Gift Shop.

## COUNT II
### (Breach of Guaranty – Payments to Affiliates)

93.     The Lender repeats the allegations contained in paragraphs 1 through 92 above, as if fully set forth herein.

94.     The Guaranty is a valid and enforceable contract, which was executed by Guarantors in favor of Lender.

95.     Under paragraph 1 of the Guaranty, the Guarantors "jointly and severally . . . absolutely and unconditionally guarantee to Lender the prompt and unconditional payment of the Guaranteed Obligations . . .."

96.     The Guaranty defines "Guaranteed Obligations" to include "all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Article 13 of the Loan Agreement."

97.     Section 13.1(a)(viii) of the Loan Agreement imposes personal liability on the Borrower for any fees or commissions paid by Borrower to its affiliates after the occurrence of an Event of Default.

98.     In violation of the Loan Agreement, Borrower disbursed $430,389.02 to its affiliates for various fees and commissions after the occurrence of the Monetary Default in April of 2020.

99.     In connection with the Restaurant, Borrower paid a 3.25% management fee to Mr. Yang and "consulting fees" in the amount of $249,563. to CCY Management for calendar years 2020 and 2021.

100.     Borrower's payments to its affiliates, including Mr. Yang, CCY Management, Tower Development, Tower Construction, and MR Hawaii were done at a time when the Lender, other vendors and creditors were not being paid.

101.     Section 13.1(a)(xiv) of the Loan Agreement imposes personal liability on the Borrower for any violations or breaches of the representations, warranties and covenants contained in Article 5 of the Loan Agreement.

102.     Borrower promised in Section 5.1(a)(iv) of the Loan Agreement that it would adhere to the provisions of its organizational documents.

103.     Section 6.15.1.3 of Borrower's Operating Agreement provides for the payment of asset management fees to Tower Development only after Borrower has paid its monthly debt service and reserve obligations under the Loan Documents.

104.     Borrower ceased paying its monthly debt service and reserve obligations in April of 2020.

105.     In violation of its Operating Agreement, Borrower paid Tower Development approximately $225,674.00 for "asset management services" after the Loan went into Monetary Default in April of 2020.

106.     Pursuant to Paragraphs 1 and 2 of the Guaranty, the Lender has the right to look to the Guarantors for the payment of the obligations and liabilities of the Borrower that arose as a result of the Borrowers payment of fees and commissions Mr. Yang, CCY Management, Tower Development, Tower Construction, and MR Hawaii.

BADOCS/56090659

## COUNT III
### (Breach of Guaranty – Restaurant Financials)

107.     The Lender repeats the allegations contained in paragraphs 1 through 106 above, as if fully set forth herein.

108.     The Guaranty is a valid and enforceable contract, which was executed by Guarantors in favor of Lender.

109.     Under paragraph 1 of the Guaranty, the Guarantors "jointly and severally . . . absolutely and unconditionally guarantee to Lender the prompt and unconditional payment of the Guaranteed Obligations . . .."

110.     The Guaranty defines "Guaranteed Obligations" to include "all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Article 13 of the Loan Agreement."

111.     Section 13.1(a)(i) of the Loan Agreement provides for personal liability for the Borrower, and correspondingly for the Guarantors, for fraud or intentional misrepresentation of a material fact in connection with the Loan.

112.     Section 13.1(a)(xiv) of the Loan Agreement provides for personal liability for the Borrower, and correspondingly for the Guarantors, for any violation or breach of any representation, warranty or covenant contained in Article 5 of the Loan Agreement.

113.     The financial statements that Borrower provided the Lender, which reflected revenue, expenses and gross operating profit for the Restaurant to which the Borrower was not entitled were false and misleading.

114.     By overstating the expenses and understating the profits associated with the Restaurant, Borrower misrepresented its financial condition to the Lender.

115.    The inclusion of the revenue, expenses and profits for the Restaurant on the Borrower's financial statements violated the requirement in Section 5.1(a)(viii) of the Loan Agreement that Borrower maintain its records separate from those of its affiliates.

**COUNT IV**
**(Breach of Guaranty – Costs, Fees and Expenses)**

116.    The Lender repeats the allegations contained in paragraphs 1 through 115 above, as if fully set forth herein.

117.    The Guaranty is a valid and enforceable contract, which was executed by Guarantors in favor of Lender.

118.    Paragraph 6 of the Guaranty renders the Guarantors personally liable for all costs, fees and expenses, including attorneys' fees, incurred as a result of the Lender's efforts to preserve or enforce its rights under the Guaranty or collect the Guaranteed Obligations.

119.    The Lender has and will continue to accrue, during the course of this litigation, costs, fees and expenses, including attorneys' fees, related to the enforcement of its rights under the Guaranty and the pursuit of the collection of the Guaranteed Obligations from the Guarantors.

WHEREFORE, Plaintiff prays that the Court:

A.    Enter a monetary judgment, in an amount to be determined at trial, in Plaintiff's favor and against Defendant Edward Bushor of not less than $1,368,243.34, plus applicable pre- and post-judgment interest, costs, fees and expenses incurred enforcing the Loan Documents;

B.    Enter a monetary judgment, in an amount to be determined at trial, in Plaintiff's favor and against Defendant Stuart Miller of not less than $1,368,243.34, plus

BADOCS/56090659

applicable pre- and post-judgment interest, costs, fees and expenses incurred enforcing the Loan

Documents; and

        C.      Award Plaintiff its attorneys' fees, costs and expenses incurred herein, and

such other and further relief as is just and equitable.

Dated: August 8, 2022                VENABLE LLP
New York, New York

                   By:       */s/ Gregory A. Cross*
                              Gregory A. Cross
                              Heather Deans Foley (to be admitted *pro hac vice*)
                              Venable LLP
                              750 East Pratt Street, Suite 900
                              Baltimore, Maryland 21202
                              Telephone: (410) 244-7400

                              -and-

                              Adam Possidente
                              Rockefeller Center
                              1270 Avenue of the Americas, 24th Floor
                              New York, New York 10020
                              Telephone: (212) 307-5500

                              *Counsel for Plaintiff*

BADOCS/56090659