# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILMINGTON TRUST NATIONAL ASSOCIATION AS TRUSTEE FOR THE BENEFIT OF THE HOLDERS OF BANK 2018-BNK14, COMMERCIAL MORTGAGE SERIES 2018-BNK14, by and through its Special Servicer Rialto Capital Advisors, LLC, | |
| Plaintiff, | Case No. 1:22-cv-06743-ALC |
| v. | |
| EDWARD BUSHOR and STUART L. MILLER, | |
| Defendants. | |
| EDWARD BUSHOR and STUART L. MILLER, | |
| Third-Party Plaintiffs, | |
| v. | |
| RIALTO CAPITAL ADVISORS, LLC | |
| Third-Party Defendant. | |

## AMENDED ANSWER AND THIRD-PARTY COMPLAINT

Defendants Edward Bushor and Stuart L. Miller ("Guarantors") answer the Complaint of

Plaintiff Wilmington Trust National Association, as Trustee for the Benefit of the Holders of Bank

2018-BNK14, Commercial Mortgage Series 2018-BNK14, by and through its Special Servicer

Rialto Capital Advisors, LLC ("Lender") as follows:

## PARTIES[1]

1.      Plaintiff is and was, at all times relevant, a New York common law trust for which

---

[1]      Guarantors do not deem the section headings in the Complaint to constitute allegations of the Complaint.  To the extent any section headings are allegations, Guarantors admit or deny them consistent with the responses to the allegations contained in the numbered paragraphs of the Complaint.

Wilmington Trust National Association is the Trustee ("Wilmington Trust"). Wilmington Trust is a national banking association, having its principal office located in Delaware.

ANSWER: Guarantors deny knowledge and information sufficient to admit the allegations in

Paragraph 1.

2. Defendant Edward Bushor ("**Bushor**") is an individual having an address at 625 Hanale Place, Kailua, Hawaii 96734.

ANSWER: Guarantors admit the allegations in Paragraph 2.

3. Upon information and belief, Mr. Bushor is the CEO of Tower Development, Inc. ("**Tower Development**").

ANSWER: Guarantors admit the allegations in Paragraph 3.

4. Defendant Stuart L. Miller ("**Miller**" and together with Bushor, the "**Guarantors**") is an individual having an address at 35-229 Kihalani Homestead Road, Laupahoehoe, Hawaii 96764.

ANSWER: Guarantors admit the allegations in Paragraph 4.

5. Upon information and belief, Mr. Miller is the President of Tower Development.

ANSWER: Guarantors admit the allegations in Paragraph 5.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) in that this action is between citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

ANSWER: Guarantors admit the allegations in Paragraph 6.

7. Plaintiff is a national banking association and, pursuant to 28 U.S.C. § 1348, is a citizen and resident of the State of Delaware.

ANSWER: Guarantors admit the allegations in Paragraph 7.

8. Defendant Bushor is a natural person and is a citizen and resident of the State of Hawaii.

ANSWER: Guarantors admit the allegations in Paragraph 8.

9. Defendant Miller is a natural person and is a citizen and resident of the State of Hawaii.

ANSWER: Guarantors admit the allegations in Paragraph 9.

10.    This Court has personal jurisdiction over the Defendants because they each irrevocably submitted in writing to the jurisdiction of this Court.

ANSWER: Guarantors admit that jurisdiction is proper in New York.

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because each of the Defendants irrevocably (a) waived any objection to the laying of venue in this Court and (b) waived any claim that an action brought in this Court has been brought in an inconvenient forum.

ANSWER: Guarantors admit that venue is proper in this District.

## PRELIMINARY STATEMENT

12.    This case involves the repeated and systematic efforts by the owners of a hotel to misappropriate more than $1.3 million in rent and revenue from the property. The actions being complained of were done to the detriment of Plaintiff, as lender, and in direct violation of governing loan documents, all for the benefit of insiders and affiliates. Indeed, during a national pandemic when vendors, suppliers, creditors and employees of the hotel were receiving reduced or no payments, the owners of the hotel and their affiliates were (i) diverting rent from the hotel's restaurant and gift shop and (ii) paying themselves exorbitant fees from the property's operating revenue.

ANSWER: Paragraph 12 contains legal conclusions to which no response is required. To the

extent any further response is required, Guarantors deny the allegations in Paragraph 12.

13.    Although the full extent of the ownership's greed is not known at this point, the recent appointment of a Receiver to oversee the property's operations has revealed the following with respect to the hotel restaurant:

        a.    Just a year after the $50 million loan was made and in complete disregard of an existing space lease, the ownership agreed to shift control of the hotel restaurant to an affiliate and to restructure the terms of the "lease" -- all without the approval of the lender. The purported structure of the new deal calls for a split of the operating profit -- 51% to the hotel and 49% to the restaurant. The 51% due to the hotel was characterized as "rent."

        b.    Rather than simply include the 51% "rent" on the hotel's financial statements as additional income, in what appears to be an effort to hide the fact that this new deal had been struck, the entire operating detail (revenue and expenses) for the restaurant has inexplicably been included in the hotel financial statements that were provided to the lender.

        c.    Buried within the financial detail of the restaurant operations is the fact that the new restaurant deal also allows for an affiliate to receive a 3.25% management fee and an additional "consulting fee" in the amount of $10,471.20 per month. Each of those "costs" are factored into the expenses for operating the restaurant thereby reducing the operating profit, such

that these monthly payments to affiliates serve to reduce what is supposed to be the "rent" paid to the hotel.

       d.     Despite this elaborate construct, ***none of the "rent" from the restaurant has been put in the hotel's operating account*** or used for the operation of the hotel property in over two years. Indeed, it appears that there is in excess of $341,372.03 in missing "rent.

ANSWER:  Guarantors deny the allegations in Paragraph 13.

     14.     The diversion of rents did not stop with the restaurant or when the lender began trapping the property's cash in the Fall of 2021. Lender is of the belief that the gift shop is leased to an affiliate of the hotel's ownership and that when the gift shop ceased making the required monthly rental payments in 2020, the hotel was instructed not to pursue any collection efforts. Recently, when the gift shop operator did finally deliver a check to the hotel for over $18,000 in past due rent, rather than endorse the check over to the property manager, remit the funds to the lender or place the funds in the property's operating account, ownership arranged to have the check picked up from the hotel.

ANSWER:  Guarantors deny the allegations in Paragraph 14.

     15.     Not only are funds being funneled away from the property and directly to insiders and affiliates, an audit of the hotel's books and records revealed that revenue from the property has been used to make more than $430,000 worth of improper payments to affiliated companies since 2020.

ANSWER:  Guarantors deny the allegations in Paragraph 15.

     16.     The full nature and extent of the abuses perpetrated upon the rents and revenues of the property by the owner's affiliates has only begun to come to light.

ANSWER: Guarantors deny the allegations in Paragraph 16.

     17.     Although it appears that Mr. Bushor and/or Mr. Miller were the architects behind the various schemes used to misappropriate these funds, their actual knowledge or involvement is irrelevant because they executed a loan guaranty that renders them jointly and severally liable for each dollar that has been diverted, misappropriated and/or misapplied.

ANSWER: Guarantors deny the allegations in Paragraph 17, except that Guarantors admit that

they signed a "Guaranty of Recourse Obligations" in connection with the commercial mortgage

loan referenced in the Complaint.

# STATEMENT OF FACTS

## The Loan

18.    Pursuant to a Loan Agreement dated as of August 31, 2018 (the "**Loan Agreement**"), between WHR LLC (the "**Borrower**"), on the one hand, and Wells Fargo Bank, National Association ("**Original Lender**"), on the other hand, Original Lender agreed to make a loan to the Borrower in the original principal amount of $50,000,000.00 (the "**Loan**"), subject to the terms and conditions of the Loan Agreement. A true and exact copy of the Loan Agreement is attached hereto as **Exhibit A**.

ANSWER:  Guarantors admit that WHR LLC entered into a Loan Agreement with Wells Fargo Bank, National Association.  Guarantors deny the remaining allegations in Paragraph 18 and refer to the documents referenced therein for their contents.

19.    The Loan is evidenced by a Promissory Note in the amount of $50,000,000.00 (the "**Note**"). A true and exact copy of the Note is attached hereto as **Exhibit B**.

ANSWER:  Guarantors admit that WHR LLC signed a Promissory Note in connection with the Loan referenced in the Complaint.  Guarantors deny the remaining allegations in Paragraph 19 and refer to the documents referenced therein for their contents.

20.    The Note is secured by a Leasehold Mortgage, Assignment of Leases And Rents, Security Agreement and Fixture Filing (the "**Mortgage**") on certain nonresidential real property commonly known as the Grand Naniloa Hotel Hilo – a DoubleTree by Hilton and located at 93 Banyan Drive and 1713 Kamehameha Avenue in Hilo, Hawaii, identified by Tax Map Key Nos. (3) 2-1-001: 012 and (3) 2-1-005: 013,016, 017, 032, 046 & 027 (all as more particularly described in the Mortgage and other loan documents, the "**Property**").

ANSWER:  Guarantors admit that WHR LLC executed a "Leasehold Mortgage, Assignment of Leases And Rents, Security Agreement and Fixture Filing" in connection with the Loan referenced in the Complaint.  Guarantors deny the remaining allegations in Paragraph 20 and refer to the documents referenced therein for their contents.

21.    In connection with the Loan, the Defendants executed a Guaranty of Recourse Obligations dated August 31, 2018 (the "**Guaranty**"). A true and exact copy of the Guaranty is attached as **Exhibit C**. The Loan Agreement, the Note, the Mortgage, the Guaranty and all related documents are collectively referred to hereinafter as the "**Loan Documents**."

ANSWER: Guarantors admit that they executed a "Guaranty of Recourse Obligations" in connection with the Loan referenced in the Complaint. Guarantors deny the remaining allegations in Paragraph 21 and refer to the documents referenced therein for their contents.

22. By virtue of an Allonge (the "**Allonge**"), an Assignment of Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing effective as of September 27, 2018 (the "**Mortgage Assignment**") and a General Assignment effective as of September 27, 2018, (the "**General Assignment**"), Original Lender assigned all of its right, title and interest in Note and the Loan Documents to the Lender. A copy of the Allonge is included with Note attached Exhibit B. A copy of the General Assignment is attached as Exhibit D.

ANSWER: Guarantors admit that an Allonge, an "Assignment of Leases and Rents, Security Agreement and Fixture Filing," and a "General Assignment" were executed in connection with the Loan referenced in the Complaint. Guarantors deny the remaining allegations in Paragraph 22 and refer to the documents referenced therein for their contents.

**The Defaults**

23. Article 2 of the Note, Section 7.1 of the Mortgage, and Section 10.1 of the Loan Agreement provide that an Event of Default occurs if any portion of the monthly debt service or required reserve funds are not paid when due.

ANSWER: Guarantors deny the allegations in Paragraph 23 and refer to the documents referenced therein for their contents.

24. Pursuant to the Loan Agreement, the Borrower is obligated to pay monthly installments of principal and interest, together with required reserve payments, on the eleventh (11th) day of each calendar month.

ANSWER: Guarantors deny the allegations in Paragraph 24 and refer to the documents referenced therein for their contents.

25. The Borrower admits that it failed to comply with the terms of the Loan Documents and was in default thereunder by virtue of, among other things, its failure to pay the monthly installments of principal and interest beginning in April of 2020 and continuing each month thereafter (the "**Monetary Defaults**").

ANSWER: Guarantors admit that as a direct consequence of the COVID-19 pandemic, and the coincident loss in revenue at the Hotel (and in the hospitality industry in Hawaii generally),

Borrower was unable to make certain payments on the Loan beginning in April 2020. Guarantors deny the remaining allegations in Paragraph 25.

26. By reason of said Monetary Defaults and pursuant to the provisions of the Loan Documents, by letter dated July 23, 2021, Borrower was given written notice that (i) an Event of Default existed under the Loan Documents as a result of Borrower's failure to pay the monthly debt service payment due on April 11, 2020 and each month thereafter; and (ii) the Lender accelerated the maturity date of the Loan and demanded that the Borrower pay the Loan in full (including, without limitation, accrued interest calculated at the "Default Rate," as such term is defined in the Loan Agreement). A true and exact copy of the July 23, 2021 Acceleration Letter is attached hereto as **Exhibit E**.

ANSWER: Guarantors admit that Borrower received a letter dated July 23, 2021 purporting to provide notice of an Event of Default in connection with the Loan referenced in the Complaint. Guarantors deny the remaining allegations in Paragraph 26 and refer to the documents referenced therein for their contents.

27. In addition to the Monetary Defaults, as disclosed on financial reports provided by the Borrower to Plaintiff, the Borrower was also in violation of Section 5.1 of the Loan Agreement as a result of entering into the following unauthorized debt obligations without Lender knowledge and consent: (i) $4 million in member loans and advances; (ii) a Paycheck Protection Program loan in the amount of $1,525,790 on May 4, 2020; (iii) a Paycheck Protection Program loan in the amount of $1,956,066 on February 26, 2021; and (iv) an Economic Injury Disaster Loan in the amount of $159,900 in July of 2020 (collectively, the "**Non-Monetary Defaults**" and together with the Monetary Defaults, the "**Events of Default**").

ANSWER: Paragraph 27 contains legal conclusions to which no response is required. To the extent any further response is required, Guarantors deny any violations of Section 5.1 or any other provisions in the Loan Agreement, aver that Lender was aware of and/or approved any applicable member loans and advances, and otherwise deny the allegations in Paragraph 27.

28. As a result of the foregoing Events of Default and pursuant to the terms of the Loan Documents, the Lender (i) began trapping the Property's revenue in the Fall of 2021; (ii) filed a foreclosure complaint on December 6, 2021; and (iii) sought and obtained the appointment of a receiver for the Property on June 3, 2022.

ANSWER: Guarantors admit that Lender trapped all revenue from the Hotel beginning in September 2021, and that a foreclosure complaint in connection with the Loan referenced in the

Complaint was filed on December 6, 2021. Guarantors further admit that a receiver was appointed over the Property, with the approval of Borrower and Guarantors, on June 7, 2022, subject to the condition that the Receiver would "cooperate with the Defendant's [Borrower's] efforts to refinance Plaintiff's loan." Guarantors deny the remaining allegations in Paragraph 28.

29.     By letter dated January 12, 2022, Hilton issued a default and termination notice based on the existence of more than $800,000 in past due amounts dating back to November of 2020, which were due and owing under the terms of that certain Franchise Agreement effective as of March 12, 2015.

ANSWER:  Guarantors admit that an affiliate received a letter from an affiliate of Hilton Worldwide Services, Inc ("Hilton") regarding alleged defaults under a Franchise Agreement, and aver that the default and termination notice from Hilton was the direct consequence of Rialto's wrongful and reckless failure to pay Hilton under the Franchise Agreement from funds available for that purpose, despite repeated requests from Hilton and an understanding of the ramifications to Borrower and Guarantors should Rialto fail to pay Hilton. Guarantors deny the remaining allegations in Paragraph 29 and refer to the documents referenced therein for their contents.

30.     After the Loan was accelerated, the Borrower made partial payments on September 13th, October 8th, November 9th and December 9th of 2021, which totaled $1,635,842.04 in the aggregate.

ANSWER:  Guarantors deny that any "partial payments" were made, and aver that full and complete payments of monthly debt service in respect of the Loan were made in September, October, November, and December of 2021. Guarantors deny the remaining allegations in Paragraph 30.

31.     As of May 31, 2022, the unpaid principal balance of the Loan was $48,917,177.03. Interest (including default interest), late charges, servicing and administrative fees, expenses, attorneys' fees and costs continue to accrue under the Loan Documents.

ANSWER:  Guarantors deny the allegations in Paragraph 31.

32.     Borrower has failed to pay the Loan in full and remains in default under the terms of the Loan Documents.

<u>ANSWER</u>:  Guarantors admit that WHR LLC has not repaid the Loan because Rialto has attached false and fraudulent demands to every good faith attempt by Borrower to repay the Loan "in full," including a demand that Borrower pay more than $4 million in retroactive default interest not permitted by the Loan Agreement.  Guarantors aver that Rialto's bad acts have caused Borrower and Guarantors substantial losses, including refinancing costs, lost opportunities to refinance the Loan, lost opportunities independent of the Hotel, and harm to reputation.  Guarantors deny the remaining allegations in Paragraph 32.

**<u>The Audit</u>**

33.    By letter dated January 20, 2022, the Lender notified the Borrower that it had engaged FTI Consulting, Inc. ("**FTI**") to conduct a review and audit of the Borrower's financial affairs.

<u>ANSWER</u>:    Guarantors admit that Borrower received a letter from Lender on or around January 20, 2022 regarding FTI.  Guarantors deny the remaining allegations in Paragraph 33 and refer to the documents referenced therein for their contents.

34.    FTI's review and audit of the Borrower's books and records confirmed the existence of the Events of Default, and also uncovered significant self-dealing between Borrower and Borrower affiliates, at the direction and control of Mr. Bushor, during a time when the Loan was in default, no payments were being made to the Lender and third-party creditors, including Hilton Hotels, were going unpaid.

<u>ANSWER</u>:  Guarantors lack knowledge or information sufficient to form a belief as to a review and audit by FTI, but otherwise deny the allegations in Paragraph 34.

35.    During 2020 and 2021, Borrower paid Borrower-affiliated entities more than $430,000.

<u>ANSWER</u>:  Guarantors deny the allegations in Paragraph 35, and aver that Guarantors executed documents allowing for the receipt of "PPP" funds (since forgiven) by Guarantors, for the benefit of the Hotel, a portion of which were used by Guarantors to manage and preserve the Hotel during the COVID-19 pandemic. Guarantors' use of these funds for the benefit of the

Hotel preserved the value of Lender's collateral, ensured the viability of the Hotel during an extraordinarily challenging period for the hospitality industry, and contributed to the Hotel's profitability today. Guarantors otherwise deny the allegations in Paragraph 35.

36. The following chart shows a summary of funds that were disbursed to Borrower-affiliated entities, including Tower Development, Tower Commercial LLC ("**Tower Commercial**"), Tower Construction Hawaii, Inc. ("**Tower Construction**") and MR Hawaii LLC ("**MR Hawaii**"), in calendar years 2020 and 2021:

| Borrower-Affiliated Entity | 2020 | 2021 | Total |
|---|---|---|---|
| Tower Development | $74,648.40 | $183,789.20 | $258,437.60 |
| Tower Commercial | $0.00 | $72,918.42 | $72,918.42 |
| Tower Construction | $22,676.16 | $0.00 | $22,676.16 |
| MR Hawaii | $39,079.12 | $37,277.72 | $76,356.84 |
| TOTAL | $136,403.68 | $293,985.34 | $430,389.02 |

ANSWER: Guarantors deny the allegations in Paragraph 36, and aver that Guarantors executed documents allowing for the receipt of "PPP" funds (since forgiven) by Guarantors, for the benefit of the Hotel, a portion of which were used by Guarantors to manage and preserve the Hotel during the COVID-19 pandemic, including certain of the payments identified in Paragraph 36, which were made in exchange for services rendered and at below-market value. Guarantors' use of these funds for the benefit of the Hotel preserved the value of Lender's collateral, ensured the viability of the Hotel during an extraordinarily challenging period for the hospitality industry, and contributed to the Hotel's profitability today. Guarantors otherwise deny the allegations in Paragraph 36.

37. Of the funds disbursed to Tower Development in 2020 and 2021, approximately $225,674.00 was for "asset management services" based upon a rate of $10,471.20 per month.

ANSWER:  Guarantors deny the allegations in Paragraph 37, and aver that any funds disbursed were the funds of Guarantors and utilized for the benefit of the Hotel.

38.     In accordance with Section 6.15.1.3 of the Amended and Restated Operating Agreement of WHR LLC dated as of August 28, 2018 (the "Operating Agreement"), the Asset Management Services Fee "shall only be paid [to Tower Development] to the extent that there exists excess cash flow after the payment of the monthly debt service and any additional obligations under the loan."

ANSWER:  Guarantors deny the allegations in Paragraph 38, aver that any funds disbursed were the funds of Guarantors and utilized for the benefit of Borrower and the Hotel, and aver further that the Operating Agreement neither governs nor speaks to the use of PPP funds.

39.     The payments to Tower Development in 2020 and 2021 were done in violation of Section 6.15.1.3 of the Borrower's Operating Agreement because monthly debt service payments were not being made to Lender beginning in April of 2020.

ANSWER:  Paragraph 39 contains legal conclusions to which no response is required.  To the extent any further response is required, Guarantors deny the allegations in Paragraph 39, aver that any funds disbursed were the funds of Guarantors and utilized for the benefit of the Hotel, and aver further that the Operating Agreement neither governs nor speaks to the use of PPP funds.

40.     Of the funds paid to MR Hawaii in 2020 and 2021, $49,795.47 was for unspecified "project management fees."

ANSWER:  Guarantors deny the allegations in Paragraph 40, aver that any funds disbursed were the funds of Guarantors and utilized for the benefit of the Hotel, and aver further that the Operating Agreement neither governs nor speaks to the use of PPP funds.

41.     The 2021 distribution to Tower Commercial of $72,918.42 was characterized as "PPP Loan Origination" fees.

ANSWER:  Guarantors deny the allegations in Paragraph 41, and aver that any funds disbursed were the funds of Guarantors and fair consideration for services rendered, as authorized by the Operating Agreement.

42.     According to Section 6.15.1.5 of the Operating Agreement, Tower Commercial is a licensed Hawaii real estate brokerage company, designated to market and oversee a sale of the Property in exchange for compensation based on the sales price.

ANSWER:  Guarantors deny the allegations in Paragraph 42 and aver that any funds disbursed were the funds of Guarantors and fair consideration for services rendered, as authorized by the Operating Agreement.

**The Affiliate Restaurant Lease**

43.     Pursuant to that certain Hotel Restaurant Lease dated as of April 13, 2018 (the "**Restaurant Lease**"), Borrower leased the Hula Hulas Restaurant at the Property (the "**Restaurant**") to HH Hilo LLC, an affiliate of Borrower.

ANSWER:  Guarantors admit that WHR LLC entered into a Hotel Restaurant Lease with HH Hilo LLC.  Guarantors deny the remaining allegations in Paragraph 43.

44.     In the Fall of 2019, without notice to or approval from the Lender, another borrower affiliate, Chad Yang, the Director of Food & Beverage for Tower Development, took over as the operator of the Restaurant and, in connection therewith, Mr. Bushor reported to the property manager that new arrangement with Mr. Yang involved an agreed upon split of profits whereby Borrower was to receive 51% as its "rent" and the Restaurant and/or Mr. Yang's operating company, CCY Management, was to receive 49%.

ANSWER:  Guarantors deny the allegations in Paragraph 44.

45.     Mr. Bushor failed to disclose, however, that under the terms of his new deal, Mr. Yang and/or CCY Management would also receive a 3.25% management fee and an additional "consulting fee" in the amount of $10,471.20 per month, each of which would be included in the expenses of the Restaurant prior to the calculation of the split of profits among the Borrower and the Restaurant.

ANSWER:  Guarantors deny the allegations in Paragraph 45.

46.     As part of the agreement that Borrower receive 51% of the Restaurant profits, Borrower is responsible for supplying all of the utilities and major facilities to the Restaurant.

ANSWER:  Guarantors deny the allegations in Paragraph 46.

47.     In addition, based upon information and belief, Borrower holds the liquor license upon which the Restaurant relies to serve alcohol.

ANSWER:  Guarantors admit that Borrower holds a liquor license.  Guarantors deny the remaining allegations in Paragraph 47.

48.      According to Mr. Bushor, the rent due Borrower from the Restaurant was not determined on a monthly basis, rather a reconciliation was done twice in each calendar year, on June 30 and December 30.

ANSWER:  Guarantors deny the allegations in Paragraph 48.

49.      As of September 22, 2020, Mr. Bushor reported that Borrower had received over $170,000 of rent in ten (10) months based on the reconfigured arrangement with Mr. Yang, which averaged out to be approximately $17,000 per month as "rent" for the restaurant space.

ANSWER:  Guarantors deny the allegations in Paragraph 49.

50.      Upon information and belief, since 2020, the bookkeeper for the Restaurant sends the Restaurant's financial statements, including revenue, expenses and gross operating profit, to Borrower's accountant and, once approved by Mr. Yang and Mr. Bushor, Borrower's accountant sends an entry that summarizes the activity at the Restaurant to Evolution Hospitality (the "**Property Manager**") for inclusion in Borrower's consolidated P&L statements.

ANSWER:  Guarantors deny the allegations in Paragraph 50.

51.      Borrower's P&L statements, which were provided to the Lender, did not reveal the 49% allocation to the restaurant, the 3.25% management fee or the $10,471.20 monthly consulting fee that were being paid to Mr. Yang and/or CCY Management.

ANSWER:  Guarantors deny the allegations in Paragraph 51.

52.      Despite the fact the Restaurant has operated at a profit since 2020 and financial reporting for the Restaurant was being included on Borrower's P&L statements, ***no rent from the Restaurant was actually deposited into the Property's operating account since 2020***.

ANSWER:  Guarantors deny the allegations in Paragraph 52, and aver that all of the monies generated in respect of the Restaurant (approximately $900,000) are currently held in an account associated with HH Hilo and owned and controlled by Borrower, as the sole shareholder of HH Hilo.

53.      Upon information and belief, all revenue from the Restaurant was deposited into one or more accounts that were in the name of Borrower's affiliate, HH Hilo LLC, and thereafter disbursed to Mr. Yang's company or Borrower affiliates controlled by Mr. Bushor, including Tower Development, Tower Construction and MR Hawaii.

ANSWER: Guarantors deny the allegations in Paragraph 53, and aver that all of the monies generated in respect of the Restaurant (approximately $900,000) were not "thereafter disbursed" to Mr. Yang or any Borrower affiliates, but rather, are currently held in an account associated with HH Hilo and owned and controlled by Borrower, as the sole shareholder of HH Hilo.

**The Gift Shop Lease**

54. The gift shop at the Property, Kapohokine (the "**Gift Shop**"), is leased to Hawaii Performance Partners LLC pursuant to the terms of that certain Hotel Retail Lease dated February 1, 2016.

ANSWER: Guarantors admit that Borrower entered into a Hotel Retail Lease with Hawaii Performance Partners LLC. Guarantors deny the allegations in Paragraph 54 and refer to the documents referenced therein for their contents.

55. The owners or operators of the Gift Shop are, on information and belief, affiliated with the Borrower as minority investors.

ANSWER: Guarantors deny the allegations in Paragraph 55.

56. The current base rent for the Gift Shop is $3,517.50 per month, plus additional rent based on a percentage of store sales, made market sales and rental/tours sales.

ANSWER: Guarantors deny the allegations in Paragraph 56 and refer to the relevant Hotel Retail Lease documents for their contents.

57. Prior to March of 2020, the Gift Shop made payments to Borrower, which were deposited into the Property's operating account.

ANSWER: Guarantors admit that Hawaii Performance Partners LLC made rent payments to Borrower. Guarantors deny the remaining allegations in Paragraph 57.

58. During the COVID pandemic in 2020, the Gift Shop ceased paying rent to Borrower, and did not make any rent payments in 2021.

ANSWER: Guarantors admit the allegations in Paragraph 58.

59. Upon information and belief, when the Gift Shop stopped making rent payments to the hotel, the Property Manager was instructed not to pursue any collection efforts.

<u>ANSWER</u>:  Guarantors deny the allegations in Paragraph 59.

60.     Upon information and belief, in May of 2022, the Gift Shop issued a check in the name of the Borrower for $18,933.80, which covered the rent from February of 2022 through May of 2022 (the "**May Rent Check**").

<u>ANSWER</u>:  Guarantors deny the allegations in Paragraph 60.

61.     Upon information and belief, the May Rent Check was not deposited into the Property's operating account and was, instead, picked up from the hotel by Borrower at Mr. Bushor's direction.

<u>ANSWER</u>:  Guarantors deny the allegations in Paragraph 61.

**<u>The Guaranty</u>**

62.     Pursuant to Paragraphs 1, 2 and 4 of the Guaranty, the Lender has the right to look to the Guarantors for the prompt and unconditional payment of the recourse obligations and liabilities of the Borrower that arise under Article 13 of the Loan Agreement (collectively, the "**Guaranteed Obligations**").

<u>ANSWER</u>:  Paragraph 62 contains legal conclusions to which no response is required.  Guarantors

otherwise deny the allegations in Paragraph 62 and refer to the documents referenced therein for

their contents.

63.     Section 13.1(a) of the Loan Agreement provides that the Borrower shall be personally liable "to the extent of any Losses incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with any of the following:

*               *               *

(i) fraud or intentional misrepresentation or any failure to disclose a material fact by Borrower, any SPE Component Entity, Guarantor, Sponsor, or any Borrower Party in connection with the Loan;

*               *               *

(iv) the misapplication, misappropriation or conversion by Borrower of . . . any Rents . . .

*               *               *

(viii) any fees or commissions paid by Borrower after the occurrence of any Event of Default to Guarantor, Sponsor and/or any Affiliate of Borrower, Guarantor and/or Sponsor in violation of the terms of

the Note, this Agreement, the Security Instrument or the other Loan Documents;

                    *               *               *

(xiv) any violation or breach of any representation, warranty or covenant contained in Article 5 hereof, to the extent that same does not result in substantive consolidation of the assets of Borrower any SPE Component Entity with the assets of any other Person; . . ..”

ANSWER:  Paragraph 63 contains legal conclusions to which no response is required.  Guarantors otherwise deny the allegations in Paragraph 63 and refer to the documents referenced therein for their contents.

64.     Section 1.1 of the Loan Agreement defines “Affiliate” to mean “as to any Person, any other Person that, directly or indirectly, owns more than twenty percent (20%) of, is in Control of, is Controlled by or is under common ownership or Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.”

ANSWER:  Paragraph 64 contains legal conclusions to which no response is required.  Guarantors otherwise deny the allegations in Paragraph 64 and refer to the documents referenced therein for their contents.

65.     Section 1.1 of the Loan Agreement defines “Guarantor” and “Sponsor” to mean Mr. Bushor and Mr. Miller.

ANSWER:  Paragraph 65 contains legal conclusions to which no response is required.  Guarantors otherwise deny the allegations in Paragraph 65 and refer to the documents referenced therein for their contents.

66.     Section 1.1 of the Loan Agreement defines “Major Lease” to include the Restaurant Lease.

ANSWER:  Paragraph 66 contains legal conclusions to which no response is required.  Guarantors otherwise deny the allegations in Paragraph 66 and refer to the documents referenced therein for their contents.

67.     Section 1.1(h) of the Mortgage defines Rents to include “all rents, additional rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties . . .

income, receivables, receipts, revenues, deposits . . ., accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Property . . . ."

ANSWER: Paragraph 67 contains legal conclusions to which no response is required. Guarantors otherwise deny the allegations in Paragraph 67 and refer to the documents referenced therein for their contents.

68. Section 4.14(b) of the Loan Agreement prohibits the Borrower from amending or modifying a Major Lease without prior Lender approval.

ANSWER: Paragraph 68 contains legal conclusions to which no response is required. Guarantors otherwise deny the allegations in Paragraph 68 and refer to the documents referenced therein for their contents.

69. Section 4.14(d) of the Loan Agreement prohibits the Borrower from terminating a Major Lease without prior Lender approval.

ANSWER: Paragraph 69 contains legal conclusions to which no response is required. Guarantors otherwise deny the allegations in Paragraph 69 and refer to the documents referenced therein for their contents.

70. Section 4.25(g) of the Loan Agreement provides that "Borrower shall not, without Lender's prior consent . . . enter into transactions with any Affiliate, including without limitation, . . . the rendering or receipt of services or the purchase or sale of inventory, except any such transaction in the ordinary course of business of Borrower and only so long as the monetary or business consideration arising therefrom would be substantially as advantageous to Borrower as the monetary or business consideration that would obtain in a comparable transaction with a person or entity not an affiliate of Borrower."

ANSWER: Paragraph 70 contains legal conclusions to which no response is required. Guarantors otherwise deny the allegations in Paragraph 70 and refer to the documents referenced therein for their contents.

71. Article 5 of the Loan Agreement contains the Single Purpose Entity/Separateness covenants of the Borrower. Specifically, Section 5.1(a) of the Loan Agreement provides that Borrower has not and will not:

(iv)    fail to observe all organizational formalities . . . or fail to comply in all material respects with the provision of its organizational documents;

&ast;            &ast;            &ast;

(vii)    incur any Indebtedness, secured or unsecured, direct or contingent . . .;

&ast;            &ast;            &ast;

(viii)    fail to maintain all of its books, records, financial statements and bank accounts separate from those of its affiliates and any constituent party.

&ast;            &ast;            &ast;

(ix)    enter into any contract or agreement with any general partner, member, shareholder, principal or affiliate, except upon terms and conditions that are commercially reasonable and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties (other than capital contributions and distributions or dividends permitted under its organizational documents); . . .

ANSWER:  Paragraph 71 contains legal conclusions to which no response is required.  Guarantors otherwise deny the allegations in Paragraph 71 and refer to the documents referenced therein for their contents.

72.    Paragraph 6 of the Guaranty renders the Guarantors personally liable for all costs, fees and expenses, including attorneys' fees, incurred by the Lender in connection with the collection of the Guaranteed Obligations or the enforcement of the Guaranty.

ANSWER:  Paragraph 72 contains legal conclusions to which no response is required.  Guarantors otherwise deny the allegations in Paragraph 72 and refer to the documents referenced therein for their contents.

73.    Pursuant to Paragraph 8 of the Guaranty, the Guarantor waived all defenses including "presentment, demand, protest or notice of any kind . . ." such that the Guaranteed Obligations are deemed immediately due and payable by Guarantor and Lender is entitled to bring suit to collect those amounts from Guarantor.

ANSWER: Paragraph 73 contains legal conclusions to which no response is required. Guarantors otherwise deny the allegations in Paragraph 73 and refer to the documents referenced therein for their contents.

74. All conditions precedent to the filing of this Complaint have been satisfied or waived.

ANSWER: Paragraph 74 contains legal conclusions to which no response is required. Guarantors otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74.

## COUNT I

### (Breach of Guaranty – Misappropriation of Rents)

75. The Lender repeats the allegations contained in paragraphs 1 through 74 above, as if fully set forth herein.

ANSWER: Guarantors incorporate by reference their responses to the allegations in Paragraphs 1 through 74 as if fully set forth herein.

76. The Guaranty is a valid and enforceable contract, which was executed by Guarantors in favor of Lender.

ANSWER: Paragraph 76 contains legal conclusions to which no response is required; Guarantors otherwise refer to the Guaranty for its contents.

77. Under paragraph 1 of the Guaranty, the Guarantors "jointly and severally . . . absolutely and unconditionally guarantee to Lender the prompt and unconditional payment of the Guaranteed Obligations . . . ."

ANSWER: Paragraph 77 contains legal conclusions to which no response is required; Guarantors otherwise refer to the Guaranty for its contents.

78. The Guaranty defines "Guaranteed Obligations" to include "all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Article 13 of the Loan Agreement."

ANSWER: Paragraph 78 contains legal conclusions to which no response is required; Guarantors otherwise refer to the Guaranty for its contents.

79. Section 13.1(a)(iv) of the Loan Agreement imposes liability on the Guarantors for the misappropriation or misapplication by the Borrower of any Rents from the Property.

ANSWER: Paragraph 79 contains legal conclusions to which no response is required; Guarantors otherwise refer to the Guaranty for its contents.

80. Based on the financial statements of HH Hilo LLC that were reviewed by FTI, the amount of rent due to the Borrower, based on a 51% profit split reconciled at year end 2020, totaled $49,937.91, while the Restaurant was to receive $47,979.56.

ANSWER: Guarantors deny information sufficient to respond to Paragraph 80, and otherwise deny the allegations in Paragraph 76.

81. Based on the financial statements of HH Hilo LLC that were reviewed by FTI, the amount of rent due to the Borrower, based on a 51% profit split reconciled at year end 2021, totaled $291,434.12, while the Restaurant was to receive $280,005.33.

ANSWER: Guarantors deny information sufficient to respond to Paragraph 81, and otherwise deny the allegations in Paragraph 76.

82. The Restaurant Lease is a Major Lease requiring the prior approval of the Lender for any amendment, modification or termination.

ANSWER: Paragraph 82 contains legal conclusions to which no response is required. To the extent any further response is required, Guarantors deny the allegations in Paragraph 82.

83. The Lender was not aware of and did not approve any change or modification of the Restaurant Lease terms, or any termination thereof.

ANSWER: Guarantors lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74.

84. Since 2020, the Rent from the Restaurant has not been deposited into the Property's operating account or otherwise utilized for the operation of the hotel.

ANSWER: Guarantors deny the allegations in Paragraph 84.

85. Based on the banking records reviewed by FTI, revenue from the Restaurant was deposited into an account maintained and controlled by Borrower's affiliate, HH Hilo LLC, and thereafter disbursed to Mr. Yang's company and other Borrower affiliates, including Tower Development, Tower Commercial, Tower Construction and MR Hawaii.

ANSWER: Guarantors lack knowledge or information sufficient to form a belief as to the truth of certain allegations in Paragraph 85. To the extent any further response is required, Guarantors deny the allegations in Paragraph 85.

86. Based on the financial information provided to FTI, the Rent from the Restaurant totals $669,356.92. That number is, however, understated because it reflects the payment in the aggregate amount of $249,563.60 to CCY Management in 2020 and 2021 for "consulting fees" that were agreed to in violation of Sections 4.14(d), 4.25(g) and 5.1(a)(ix) of the Loan Agreement.

ANSWER: Guarantors lack knowledge or information sufficient to form a belief as to the truth of certain allegations in Paragraph 86. To the extent any further response is required, Guarantors deny the allegations in Paragraph 86.

87. By entering into a new or amended Restaurant Lease without the approval of the Lender, the Borrower has diverted funds from the operation of the Property.

ANSWER: Paragraph 87 contains legal conclusions to which no response is required. To the extent any further response is required, Guarantors deny the allegations in Paragraph 87.

88. In total, since 2020, Borrower has been deprived of Rent from the Restaurant in the amount of not less than $918,920.52 (the "Diverted Restaurant Rent").

ANSWER: Guarantors deny the allegations in Paragraph 88.

89. Historically, the Rent from the Gift Shop has been deposited into the Property's operating account.

ANSWER: Guarantors deny the allegations in Paragraph 89.

90. Rather than place the May Rent Check from the Gift Shop into the Property operating account or turn those funds over to the Property Manager, the Lender or the subsequently appointed receiver, Borrower misappropriated that rent at the direction of Mr. Bushor for its own benefit.

ANSWER: Paragraph 90 contains legal conclusions to which no response is required; otherwise, Guarantors deny the allegations in Paragraph 90.

91. The misappropriated rent associated with the May Rent Check totaled $18,933.80 (the "Diverted Gift Shop Rent").

ANSWER:  Paragraph 91 contains legal conclusions to which no response is required; otherwise,

Guarantors deny the allegations in Paragraph 91.

92.     Pursuant to Paragraphs 1 and 2 of the Guaranty, the Lender has the right to look to the Guarantors for the payment of the obligations and liabilities of the Borrower that arose as a result of Borrower's misappropriation of rents from the Restaurant and Gift Shop.

ANSWER:  Paragraph 92 contains legal conclusions to which no response is required; otherwise,

Guarantors deny the allegations in Paragraph 92.

## COUNT II

### (Breach of Guaranty – Payments to Affiliates)

93.     The Lender repeats the allegations contained in paragraphs 1 through 92 above, as if fully set forth herein.

ANSWER:  Guarantors incorporate by reference their responses to the allegations in Paragraphs

1 through 92 as if fully set forth herein.

94.     The Guaranty is a valid and enforceable contract, which was executed by Guarantors in favor of Lender.

ANSWER:  Paragraph 94 contains legal conclusions to which no response is required; otherwise,

Guarantors refer to the Guaranty for its contents.

95.     Under paragraph 1 of the Guaranty, the Guarantors "jointly and severally . . . absolutely and unconditionally guarantee to Lender the prompt and unconditional payment of the Guaranteed Obligations . . . ."

ANSWER:  Paragraph 95 contains legal conclusions to which no response is required; otherwise,

Guarantors refer to the Guaranty for its contents.

96.     The Guaranty defines "Guaranteed Obligations" to include "all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Article 13 of the Loan Agreement."

ANSWER:  Paragraph 96 contains legal conclusions to which no response is required; otherwise,

Guarantors refer to the Guaranty for its contents.

97.     Section 13.1(a)(viii) of the Loan Agreement imposes personal liability on the Borrower for any fees or commissions paid by Borrower to its affiliates after the occurrence of an Event of Default.

ANSWER:  Paragraph 97 contains legal conclusions to which no response is required; otherwise,

Guarantors refer to the Loan Agreement for its contents.

98.     In violation of the Loan Agreement, Borrower disbursed $430,389.02 to its affiliates for various fees and commissions after the occurrence of the Monetary Default in April of 2020.

ANSWER:  Guarantors deny the allegations in Paragraph 98.

99.     In connection with the Restaurant, Borrower paid a 3.25% management fee to Mr. Yang and "consulting fees" in the amount of $249,563 to CCY Management for calendar years 2020 and 2021.

ANSWER:  Guarantors deny the allegations in Paragraph 99.

100.     Borrower's payments to its affiliates, including Mr. Yang, CCY Management, Tower Development, Tower Construction, and MR Hawaii were done at a time when the Lender, other vendors and creditors were not being paid.

ANSWER:  Guarantors deny the allegations in Paragraph 100.

101.     Section 13.1(a)(xiv) of the Loan Agreement imposes personal liability on the Borrower for any violations or breaches of the representations, warranties and covenants contained in Article 5 of the Loan Agreement.

ANSWER:  Paragraph 101 contains legal conclusions to which no response is required;

otherwise, Guarantors refer to the Loan Agreement for its contents.

102.     Borrower promised in Section 5.1(a)(iv) of the Loan Agreement that it would adhere to the provisions of its organizational documents.

ANSWER:  Paragraph 102 contains legal conclusions to which no response is required;

otherwise, Guarantors refer to the Loan Agreement for its contents.

103.     Section 6.15.1.3 of Borrower's Operating Agreement provides for the payment of asset management fees to Tower Development only after Borrower has paid its monthly debt service and reserve obligations under the Loan Documents.

ANSWER:  Guarantors deny the allegations in Paragraph 103 and refer to the documents referenced therein for their contents.

104.    Borrower ceased paying its monthly debt service and reserve obligations in April of 2020.

ANSWER:  Guarantors admit that Borrower has not paid monthly debt service since April 2020, and has been prevented from repaying the Loan because Rialto has attached false and fraudulent demands to every good faith attempt by Borrower to repay, including a demand that Borrower pay more than $4 million in retroactive default interest not permitted by the Loan Agreement. Guarantors otherwise deny the allegations in Paragraph 104.

105.    In violation of its Operating Agreement, Borrower paid Tower Development approximately $225,674.00 for "asset management services" after the Loan went into Monetary Default in April of 2020.

ANSWER:  Paragraph 105 contains legal conclusions to which no response is required.  To the extent any further response is required, Guarantors deny the allegations in Paragraph 105.

106.    Pursuant to Paragraphs 1 and 2 of the Guaranty, the Lender has the right to look to the Guarantors for the payment of the obligations and liabilities of the Borrower that arose as a result of the Borrowers payment of fees and commissions Mr. Yang, CCY Management, Tower Development, Tower Construction, and MR Hawaii.

ANSWER:  Paragraph 106 contains legal conclusions to which no response is required.  To the extent any further response is required, Guarantors deny the allegations in Paragraph 106 and refer to the documents referenced therein for their contents.

## COUNT III

### (Breach of Guaranty – Restaurant Financials)

107.    The Lender repeats the allegations contained in paragraphs 1 through 106 above, as if fully set forth herein.

ANSWER:  Guarantors incorporate by reference their responses to the allegations in Paragraphs 1 through 106 as if fully set forth herein.

108.    The Guaranty is a valid and enforceable contract, which was executed by Guarantors in favor of Lender.

ANSWER:  Paragraph 108 contains legal conclusions to which no response is required;

otherwise, Guarantors refer to the Guaranty for its contents.

109.    Under paragraph 1 of the Guaranty, the Guarantors "jointly and severally . . . absolutely and unconditionally guarantee to Lender the prompt and unconditional payment of the Guaranteed Obligations . . . ."

ANSWER:  Paragraph 109 contains legal conclusions to which no response is required;

otherwise, Guarantors refer to the Guaranty for its contents.

110.    The Guaranty defines "Guaranteed Obligations" to include "all obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Article 13 of the Loan Agreement."

ANSWER:  Paragraph 110 contains legal conclusions to which no response is required;

otherwise, Guarantors refer to the Guaranty for its contents.

111.    Section 13.1(a)(i) of the Loan Agreement provides for personal liability for the Borrower, and correspondingly for the Guarantors, for fraud or intentional misrepresentation of a material fact in connection with the Loan.

ANSWER:  Paragraph 111 contains legal conclusions to which no response is required;

otherwise, Guarantors refer to the Loan Agreement for its contents.

112.    Section 13.1(a)(xiv) of the Loan Agreement provides for personal liability for the Borrower, and correspondingly for the Guarantors, for any violation or breach of any representation, warranty or covenant contained in Article 5 of the Loan Agreement.

ANSWER:  Paragraph 112 contains legal conclusions to which no response is required;

otherwise, Guarantors refer to the Loan Agreement for its contents.

113.    The financial statements that Borrower provided the Lender, which reflected revenue, expenses and gross operating profit for the Restaurant to which the Borrower was not entitled were false and misleading.

ANSWER:  Guarantors deny the allegations in Paragraph 113.

114.    By overstating the expenses and understating the profits associated with the Restaurant, Borrower misrepresented its financial condition to the Lender.

ANSWER:  Guarantors deny the allegations in Paragraph 114.

115.    The inclusion of the revenue, expenses and profits for the Restaurant on the Borrower's financial statements violated the requirement in Section 5.1(a)(viii) of the Loan Agreement that Borrower maintain its records separate from those of its affiliates.

ANSWER:  Guarantors deny the allegations in Paragraph 115.

## COUNT IV

### (Breach of Guaranty – Costs, Fees, and Expenses)

116.    The Lender repeats the allegations contained in paragraphs 1 through 115 above, as if fully set forth herein.

ANSWER:  Guarantors incorporate by reference their responses to the allegations in Paragraphs

1 through 115 as if fully set forth herein.

117.    The Guaranty is a valid and enforceable contract, which was executed by Guarantors in favor of Lender.

ANSWER:  Paragraph 117 contains legal conclusions to which no response is required;

otherwise, Guarantors refer to the Guaranty for its contents.

118.    Paragraph 6 of the Guaranty renders the Guarantors personally liable for all costs, fees and expenses, including attorneys' fees, incurred as a result of the Lender's efforts to preserve or enforce its rights under the Guaranty or collect the Guaranteed Obligations.

ANSWER:  Paragraph 118 contains legal conclusions to which no response is required;

otherwise, Guarantors refer to the Guaranty for its contents.

119.    The Lender has and will continue to accrue, during the course of this litigation, costs, fees and expenses, including attorneys' fees, related to the enforcement of its rights under the Guaranty and the pursuit of the collection of the Guaranteed Obligations from the Guarantors.

ANSWER:  Paragraph 119 contains legal conclusions to which no response is required.  To the

extent any further response is required, Guarantors deny the allegations in Paragraph 119.

## GENERAL DENIAL

Guarantors deny each and every allegation in the Complaint not specifically admitted above.

## AFFIRMATIVE DEFENSES

Guarantors set forth below their affirmative defenses. By setting forth these affirmative defenses, Guarantors do not assume the burden of proving any fact, issue, or element of a cause of action where such burden properly belongs to Plaintiff. Moreover, nothing stated herein is intended or shall be construed as an admission that any particular issue or subject matter is relevant to Plaintiff's allegations. Guarantors have not knowingly or intentionally waived any applicable defenses, and hereby reserve the right, to the extent permitted by applicable law, to assert and rely upon other defenses and affirmative defenses that become available or apparent as this matter proceeds. Guarantors reserve the right to amend or seek to amend their answers and affirmative defenses as additional facts concerning their defenses become known to them.

### First Affirmative Defense

The Complaint fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

Plaintiff's claims are barred by lack of standing and lack of capacity.

### Third Affirmative Defense

Plaintiff's claims are barred by its own breach of contract, unclean hands, bad faith, and other culpable conduct.

### Fourth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver, consent, assumption of the risk, and ratification.

### Fifth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, based on the doctrine of estoppel.

### Sixth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by the doctrines of laches, statute of limitations, and statute of repose.

### Seventh Affirmative Defense

Plaintiff's claims are barred by the doctrines of impossibility, impracticality, and frustration of purpose.

### Eighth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, based on the doctrine of avoidable consequences and Plaintiff's failure to mitigate damages, if any.

### Reservation of Affirmative and Other Defenses

Guarantors may have additional defenses that are not currently known to Guarantors but that may be discovered during the course of this case, and Guarantors reserve the right to plead and raise such additional defenses as such become known to Guarantors.

### PRAYER FOR RELIEF

Wherefore, having fully answered the Complaint, Defendants request that the same be dismissed with prejudice; that Plaintiff take nothing thereby, including any attorneys' fees and costs in connection with Plaintiff's attempt to enforce the Guaranty in bad faith; that Defendants be awarded their reasonable attorney fees and costs incurred in connection with this action as allowed by law; and that Defendants be awarded such other and additional relief as may be deemed just, equitable, or proper.

\*             \*             \*

# AMENDED THIRD-PARTY COMPLAINT

Edward Bushor and Stuart L. Miller (the "Guarantors"), as and for their amended third-party complaint against Rialto Capital Advisors, LLC ("Rialto"), allege as follows:

1. This action stems from Rialto's bad faith servicing of a $50 million loan (the "Loan") made to WHR LLC ("Borrower"), secured by the Grand Naniloa Hotel by DoubleTree of Hilton (the "Hotel") in Hilo, Hawaii, for which Guarantors agreed to act as guarantor for certain limited obligations of Borrower. Borrower stands ready, willing, and able to repay the full amount actually due on the Loan to the actual lender – *i.e.*, Wilmington Trust National Association, as Trustee for the Benefit of the Holders of Bank 2018-BNK14, Commercial Mortgage Series 2018-BNK14 ("Lender") – but Rialto has refused to provide a legitimate loan payoff statement or otherwise accept payment "in full" on the Loan. Instead, Rialto has demanded that Borrower pay at least $4 million in fictitious default interest – for the benefit of Rialto and its collaborators – without justification in the contracts or the law. Guarantors seek redress for lost opportunities, loss of reputation, and other losses attributable to Rialto's bad faith servicing of the Loan.

2. Prior to the onset of the COVID-19 pandemic, Borrower timely paid each and all of its obligations to Lender. The Hotel experienced robust occupancy and Borrower complied fully with all debt service payments and other obligations under the loan documents. Following COVID-19-related lockdowns imposed by the State and County of Hawaii, travel to Hawaii plummeted, and the Hotel experienced a precipitous decline in occupancy and revenue. The lockdowns and other pandemic-related restrictions caused Borrower to miss monthly debt service payments, commencing in April 2020.

3.     As a result of the missed payments, in June 2020, Rialto assumed all responsibility for servicing the Loan and began to act as lender for the Loan in Lender's stead. Despite difficulties caused by the pandemic, Borrower and Guarantors attempted to work with Rialto to ensure that Borrower remained current on its obligations and, if issues arose, to seek additional financing. At no point between April 2020 (*i.e.*, Borrower's first missed payment) and July 2021 were Borrower or Guarantors notified of any Event of Default, monetary or otherwise, under the loan documents.

4.     In June 2021, Rialto sent Borrower and Guarantors a "Bring-Current Demand Statement" demanding payment in full on the Loan, including more than $3 million in default interest. In July 2021, Rialto noticed a monetary Event of Default under the relevant loan documents (the "July 2021 Notice") based on Borrower's failures to make monthly payments on the debt after April 2020. Rialto's July 2021 Notice stated that "interest has been and continues to accrue at the Default Rate <u>from and after April 11, 2020</u> in accordance with the Loan Documents."

5.     Thereafter, Guarantors, Borrower, and Rialto continued negotiations to bring the Loan current and rehabilitate the Hotel. After months of conversations, in February 2022, Rialto increased its demand for default interest to over $7.3 million and further demanded that any payoff of the Loan include another $5 million in fees and expenses. Rialto premised its demand for $7.3 million in default interest accruing from September 2018 – *i.e.*, the moment the Loan was issued – on a hodgepodge of false and fabricated non-monetary defaults under the loan documents.

6.     Rialto's demand for default interest was baseless and usurious. It was also precluded by the Loan Agreement, which provides that where an Event of Default has occurred

and is ongoing, overdue interest "shall accrue interest at the Default Rate, **calculated from the date such payment was due** without regard to any grace or cure periods contained herein" (emphasis added). The Loan Agreement thus specifies that default interest can accrue only from the date of a monetary or payment default; here, April 2020 at the earliest.

7.    When Borrower and Guarantors rejected Rialto's wrongful and predatory demand for default interest, Rialto retaliated by requiring payment of the loan balance in full by March 1, 2022 and demanding that Borrower and Guarantors consent to the appointment of a receiver.

8.    Faced with Rialto's bad faith ultimatum to repay more than $50 million of principal and interest on the Loan in less than two months, Borrower and Guarantors succeeded in obtaining a loan commitment from a publicly traded global asset manager ("New Lender A") that would have paid off the entire loan balance, including default interest dating to April 2020, *i.e.*, the first instance of any monetary default by Borrower.

9.    Rialto rejected Guarantors' offer to repay and refinance the full balance of the Loan, plus more than $3 million in default interest and additional fees, to injure Borrower and Guarantors. There was no lawful economic justification for Rialto's actions. As a result, Borrower's and Guarantors' loan commitment from New Lender A fell through and a receiver was appointed for the management of the Hotel.

10.    Rialto's bad faith refusal to accept repayment of the full amount actually due on the Loan (*i.e.*, the outstanding Loan balance plus all interest and costs permitted by the Loan Agreement) threatens Borrower's and Guarantors' ability to refinance the Loan going forward and has breached both the agreement governing the Guaranty (the "Guaranty Agreement") and the covenant of good faith implied therein. Among other things, Guarantors agreed to guarantee certain obligations of Borrower subject to Borrower repaying its debt; by preventing Borrower

from repaying that debt, Rialto has artificially preserved the Guaranty Agreement and deprived the Guarantors of the fruits of their bargain.

11.     Rialto's actions here are no isolated incident.  To the contrary, Rialto's actions epitomize Rialto's troubling post-pandemic practice of attempting to enrich itself at the expense of borrowers and the investor trusts that Rialto purports to act for.  Specifically, Rialto routinely coerces Borrowers to pay excessive and unlawful default interest – interest that Rialto and its collaborators are permitted to retain themselves – in exchange for the "right" to repay a loan in full.  At bottom, Borrower is ready, willing, and able to repay the entire balance of the subject Loan (plus default interest dating back to April 2020), but Rialto has refused to accept repayment in pursuit of its own financial interests.

12.     Indeed, Rialto's complaint against Guarantors in this action (the "Guaranty Complaint") is a baseless fiction not founded on actual defaults by Borrower that give rise to obligations under the Guaranty.  Rather, the Guaranty Complaint is an attempt to leverage Guarantors to pay the unlawful default interest sought by Rialto for its own benefit.

13.     Guarantors have suffered substantial harm as a direct consequence of Rialto's bad faith actions, including:  the lost opportunity to repay the Loan through refinancing from New Lender A; the lost opportunity to develop properties adjacent to the Hotel in Hawaii; and reputational and business harms as Rialto has pressed its self-interested and unlawful claims for a payoff that rewards its malicious actions.  Guarantors seek redress for these harms herein.

## PARTIES

14.     Edward Bushor is an individual residing at 625 Hanale Place, Kailua, Hawaii 96734.

15.     Stuart L. Miller is an individual residing at 35-229 Kihalani Homestead Road, Laupahoehoe, Hawaii 96764.

16.     Plaintiffs are the guarantors of a loan (the "Loan") in the principal amount of $50 million memorialized by a Loan Agreement (the "Loan Agreement"), dated as of August 31, 2018, between Borrower and Wells Fargo Bank, National Association ("Wells Fargo"), as Lender.  Guarantors' obligations are memorialized in a Guaranty of Recourse Obligations (the "Guaranty Agreement"), dated as of August 31, 2018.

17.     Third-Party Defendant Rialto Capital Advisors, LLC is a Delaware limited liability company with Delaware citizenship.  Rialto maintains a principal place of business in Miami, Florida.  Rialto acts as Special Servicer for the Loan.

18.     Upon information and belief, Rialto Capital Advisors, LLC is a limited liability company whose members are Lennar Corporation and Rialto Capital Management, LLC.  In turn, Rialto Capital Management, LLC is a limited liability company whose sole member is Lennar Corporation and Lennar Corporation is a Delaware corporation with its principal place of business in Florida.

## JURISDICTION AND VENUE

19.     Jurisdiction over Guarantors' third-party complaint is proper pursuant to 28 U.S.C. § 1332(a)(2) for diversity jurisdiction.  The parties are completely diverse because Guarantors are citizens of Hawaii, and Defendant's members are citizens of Delaware and Florida.  The amount in controversy exceeds the $75,000.00 statutory threshold.

20.     Venue is proper pursuant to 28 U.S.C. § 1391.  The loan documents which establish the relationships between the parties, including the Guaranty Agreement and the

agreement governing Rialto's role as Special Servicer designate New York as the appropriate forum for litigation.

## STATEMENT OF FACTS

**The Loan**

21.     In or around August 31, 2018, Borrower entered into the Loan Agreement with Wells Fargo in order to obtain operational funding for the Hotel.  A true and correct copy of the Loan Agreement is attached as Exhibit A to Lender's Complaint in this action.  The primary collateral for the Loan is the Hotel, the Grand Naniloa Hotel Hilo, a DoubleTree by Hilton, located at 93 Banyan Drive and 1713 Kamehameha Avenue, Hilo, Hawaii 96720.  The Hotel is subject to a franchise agreement between Borrower and Hilton Worldwide, through its subsidiary DoubleTree Franchise, LLC, pursuant to which the Hotel is branded as a "Doubletree by Hilton." Borrower must pay franchise fees pursuant to the Franchise Agreement.

22.     In connection with the Loan, Guarantors entered into the Guaranty Agreement through which they guaranteed payment of certain limited recourse obligations under the Loan Agreement.  A true and correct copy of the Guaranty Agreement is attached as Exhibit C to Lender's Complaint.

23.     After it was issued, the Loan was securitized in a commercial mortgage-backed securities ("CMBS") trust, BANK 2018-BNK14, Commercial Mortgage Series 2018-BNK14 (the "Trust") and Wells Fargo assigned its rights under the Loan Agreement to Lender.  The Trust is governed by a Pooling and Servicing Agreement (the "PSA"), dated September 1, 2018, between Morgan Stanley Capital I Inc., as Depositor, Wells Fargo Bank, National Association, as General Master Servicer, Rialto, as General Special Servicer, National Cooperative Bank, N.A., as NCB Master Servicer and as NCB Special Servicer, Wells Fargo Bank, National

Association, as Certificate Administrator, Wilmington Trust, as Trustee, and Park Bridge Lender Services LLC, as Operating Advisor and as Asset Representations Reviewer.

24.     Pursuant to the PSA, Rialto is the Special Servicer for the Loan.  As the Special Servicer, in connection with Borrower's missed payments, Rialto became Borrower and Guarantors' exclusive contact for all issues relating to the Loan.  The initial letter Rialto sent to Borrower and Guarantors stated "until further notice, any inquiries, requests and other correspondence relating to your loan should be made and addressed to the attention of Rialto Capital Advisors, LLC."

25.     In its role as Special Servicer, Rialto acts as lender for the Loan in all capacities. Rialto is the sole point of contact for questions or requests regarding the Loan.  Rialto has sole discretion to effectuate and consent to modifications of the Loan, forbearance of payments, and other issues.  As relevant here, Rialto provides Borrower and Guarantors reports on the outstanding balance of the Loan and the payment amount that would be required to pay off the Loan before maturity.

26.     While the Trustee on behalf of the Trust, *i.e.*, Wilmington Trust National Association, is nominally the Lender for the Loan, the Trustee plays no role in servicing the Loan and exercises limited to no oversight of Rialto's conduct or actions as Special Servicer. Specifically, the PSA provides that Rialto "shall have full power and authority, acting alone or . . . through one or more Sub-Servicers, to do or cause to be done any and all things in connection with such servicing and administration for which it is responsible which it may deem necessary or desirable."  PSA §3.01(b).

27.     To that end, the Trustee granted Rialto a power of attorney, which includes absolute responsibility for, among other things:

The full enforcement of and preservation of the Trustee's interests in any Mortgage Notes or the related promissory note, and in the proceeds thereof, by way of, including but not limited to, taking title to any Mortgaged Property on behalf of the Trust, foreclosure, the taking of a deed in lieu of foreclosure, or the completion of judicial or non-judicial foreclosure and/or any related litigation, including without limitation, guaranty or receivership litigation, or litigation on the note, or the termination, cancellation or rescission of any such foreclosure, the initiation, prosecution and completion of eviction actions or proceedings with respect to, or the termination, cancellation or rescission of any such eviction actions or proceedings, the initiation or defense of any litigation related to the ownership of any REO Property, and the pursuit of title insurance, hazard insurance and claims in bankruptcy proceedings, including, without limitation, any and all of the following acts:

[ . . . ]

b.      the preparation and issuance of statements of breach or non-performance;

c.      the preparation and filing of notices of default and/or notices of sale;

[ . . . ]

e.      the taking of deed in lieu of foreclosure;

f.      the filing, prosecution and defense of claims, and to appear on behalf of the Trustee, in bankruptcy cases affecting Mortgage Notes, Mortgages or deeds of trust;

[ . . . ] and

j.      the preparation and execution of such other documents and performance of such other actions as may be necessary under the terms of the Mortgage, deed of trust or state law to expeditiously complete said transactions in paragraphs 9.a. through 9.h. above.

PSA Ex. R-2.

28.      The PSA provides that "the Trustee shall not be held responsible or liable for any acts of . . . the applicable Special Servicer, or for any negligence with respect to, or misuse of, any such power of attorney by such . . . Special Servicer."  PSA § 3.01(b).

**Rights Following an Event of Default**

29.     If a defined "Event of Default" occurs and is continuing under the Loan Agreement, certain rights and remedies are available to the Rialto. Relevant here, when a monetary Event of Default occurs (*i.e.*, a missed payment of amounts due and owing under the Loan), the Loan Agreement permits default interest on the Loan "from the date such payment was due." Specifically, the Loan Agreement provides:

> Section 2.5 Interest Rate.
>
> (a)     Generally. Interest on the outstanding principal balance of the Loan shall accrue from the Closing Date up to but excluding the Maturity Date at the Interest Rate.
>
> (b)     Default Rate. In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the outstanding principal balance of the Loan and, to the extent permitted by Applicable Law, overdue interest in respect of the Loan, shall accrue interest at the Default Rate, ***calculated from the date such payment was due*** without regard to any grace or cure periods contained herein. (Emphasis added.)

30.     The Loan Agreement specifies that the standard "Interest Rate" on the Loan is 5.72% annually, while the "Default Rate" is the lesser of the maximum interest rate permitted under applicable law or 9.72%. *See* Loan Agreement at 10, 15.

31.     As Special Servicer, Rialto is entitled to retain for itself most or all of the default interest collected on a loan owned by the Trust.

32.     In connection with the Loan, Borrower, Wells Fargo, and the manager of the Hotel entered into a Cash Management Agreement (the "CMA"). Pursuant to the CMA, all rents and income generated from the Hotel may be swept into a Cash Management Account controlled by Rialto upon an Event of Default and declaration of a "Cash Trap Event Period" ("CMA Period"). Rialto may apply these amounts "toward the payment of any interest and/or principal

of the Loan and/or any other amounts due under the Loan Documents in such order, priority and proportions" as it determines.

**Events Giving Rise to this Dispute**

33.    Prior to April 2020, Borrower remained current on all payments and obligations due under and in connection with the Loan.

34.    Borrower was not immune, however, from the travel restrictions and lockdowns imposed in March 2020 in connection with the COVID-19 pandemic, which precipitated a dramatic – yet ephemeral – reduction in revenue at the Hotel.  For example, the average number of daily tourists and other travelers to Hawaii before the pandemic – 35,000 – dropped to approximately 135 from March to June 2020.  Occupancy rates and income of the Hotel declined concomitantly.  As a result, Borrower was unable to make its payment due from April 2020 through the middle of 2021.

35.    The Loan was sent to special servicing on June 9, 2020.  On June 18, 2021, Rialto sent Borrower a Bring-Current Demand reflecting all amounts past due under the Loan Agreement, along with default interest of **$3,012,900.42**.

36.    By letter to Borrower dated July 23, 2021 (the "Acceleration Letter"), counsel to Lender and Rialto declared that an Event of Default had occurred based on the failure to make monthly payments due on and after April 2020, and further declared the entire Loan due and payable on the grounds that the alleged defaults contained in the Acceleration Letter had not been cured.  The July 23 letter specifically advised Borrower that "interest has been and continues to accrue at the Default Rate **from and after April 11, 2020** in accordance with the Loan Documents."

37.     Guarantors made extraordinary efforts to return the Hotel to its former profitable status; notably, the Hotel was the only one on the island that did not close, and Guarantors expended significant time and resources to preserve the Hotel through a period of unprecedented challenges.  Due to Guarantors' efforts and the lifting of travel restrictions, occupancy rates, and income at the Hotel began to normalize.  The Hotel once again became, and has since remained, cash flow positive.  As a result of these developments, Borrower (a) made its monthly Loan payments for September 2021, October 2021, November 2021, and December 2021, (b) prepaid the rent due under the Ground Lease for the Hotel through February 2022, and (c) paid the County real property taxes for November 2021.

38.     If not for Rialto's interference, Borrower would have reinstated the Loan and continued to timely make its monthly payments in full from Hotel revenues.  Between the receipt of Rialto's June and July 2021 letters and the filing of this action, Borrower and Guarantors repeatedly worked with Rialto in good faith to bring the Loan current or refinance.  However, when the Hotel became cash-flow positive and Borrower indicated that it was prepared to reinstate the Loan by the end of 2021, Rialto adopted positions at odds with the Trust's best interests, including refusing to allow Borrower to cure past missed payments and making malicious and usurious demands for unlawful default interest that only would benefit Rialto, and which threaten recovery on the Loan for the Trust.

**Rialto Interferes with the Hotel's Income**

39.     Following the significant upturn in the Hotel's business, Rialto began sweeping all rents and income generated from the Hotel into the Rialto-controlled Cash Management Account under the CMA beginning on October 18, 2021 based on the alleged defaults identified

by Rialto in its July 23 letter.  In doing so, Rialto prevented Borrower and Guarantors from paying expenses for the Hotel in the normal course.

40.     To improve this untenable situation, on November 4, 2021, Borrower offered to cure all defaults under the Loan by November 29, 2021 and pay a workout fee to Rialto. Borrower simultaneously requested that Rialto release funds from the Cash Management Account in order to pay the operating expenses of the Hotel.

41.     Rialto refused Borrower's offer to repay the Loan and noted only that it would "consider" the request to fund expenses.  However, no funds to pay the Hotel's regular course and essential expenses were released, including employee wages, franchise fees, trade debt, Hotel manager's fees and other operating expenses.  Instead, Rialto withheld funds to force Guarantors and Borrower to make additional payments to Rialto of unlawful default interest and explicitly conditioned any future provision of funds on Borrower and Guarantors consenting to the appointment of a receiver.

42.     Around the same time, in November 2021, Rialto sent Borrower's counsel a letter detailing, for the first time, numerous alleged—and false—nonmonetary events of default.

43.     Rather than engage in good faith with Borrower's and Guarantors' efforts to negotiate a resolution of the Loan defaults, to bring the Loan current, and, ultimately to pay it off in full, Rialto responded to these overtures by filing a foreclosure action in the Hawaii Circuit Court of the Third Circuit and obtaining the appointment of a receiver.  The action, captioned *Wilmington Trust National Association as Trustee for the Benefit of the Holders of BANK 2018-BNK14, Commercial Mortgage Series 2018-BNK14, by and through its Special Servicer Rialto Capital Advisors, LLC v. WHR LLC*, Case No. 3CCV-21-0000360 (the "Foreclosure Action"), was filed on December 6, 2021 and remains pending.

44.     Notwithstanding Rialto's unlawful demand for default interest and the pending Foreclosure Action, Borrower and Guarantors continued to attempt to work with Rialto in good faith to bring the Loan current.  However, after a CMA Period of several months, the Hotel had no funds with which to operate and was defaulting on routine expenses.  When Borrower or Guarantors would request that Rialto release funds to pay these routine expenses, Rialto refused.

45.     For example, despite Borrower's repeated requests, Rialto refused to release funds for the payment of franchise fees due to Hilton Hotels International.  In an action illustrative of Rialto's bad faith dealings with Borrower, Rialto then used the franchise default manufactured by Rialto to allege an additional non-monetary default against Borrower.

46.     Shortly after the Foreclosure Action was filed, in February 2022, Rialto issued another Bring Current Demand that, for the first time, demanded $12,305,117.23 in payments in excess of principal due, including $7,357,904.12 in default interest.  Rialto explained that this increased interest accrued not upon Borrower's monetary default in April 2020, as Rialto previously stated, but upon a non-monetary event of default in September 2018, at the time the Loan was issued.

47.     As explained above, the Loan Agreement provides that Default Interest accrues only following a missed payment (*i.e.*, a monetary default).  As a result of Rialto's wrongful demand for default interest beginning more than 18 months before Borrower first missed a payment, the amount of default interest Rialto sought was more than double the maximum appropriate amount:  approximately $3 million versus approximately $7.35 million.

48.     Borrower and Guarantors demanded that Rialto correct its calculation and demand for payment.  Rialto refused.  Counsel for Rialto instead reiterated that default interest was properly being charged from September 30, 2018 due to alleged non-monetary Events of

Default, and conditioned the release of any funds for management of the Hotel on the complete payment by March 1, 2022 of the entire balance of the Loan, including the improperly charged default interest. While Rialto eventually agreed to extend this artificial deadline to March 31, 2022, it also demanded that Borrower and Guarantors consent to the appointment of a receiver in the event that full payment was not received.

49.     While Borrower and Guarantors were attempting to resolve issues related to Rialto's improper demand for default interest, the Hotel continued to deteriorate as Rialto refused to release funds for payment of the Hotel's expenses. By late 2021, the Hotel was cash-flow positive, and in 2022, the Hotel began to earn more than twice the amount of Borrower's loan payments each month. Despite this, Rialto continues to sweep all cash generated by the Hotel into the Rialto-controlled Cash Management Account and has not used a penny to pay off the Loan.

50.     Rialto has refused to apply amounts collected to pay off the Loan so that, among other things, Rialto may continue to accrue default interest that will not be paid to the Trust or the Lender, but instead to Rialto and its collaborators for their own personal benefit. Rialto is thus perversely incentivized to refuse reasonable and appropriate refinancing, reinstatement, and modification requests that would benefit the Trust and the Lender.

51.     Notwithstanding the disputes and the pending Foreclosure Action, Borrower and Guarantors have continued to seek payoff statements from Rialto and to negotiate a reasonable resolution to the Loan defaults. However, Rialto has repeatedly refused to engage in good faith and, on several occasions, has refused to provide payoff statements at all. The Hotel, now under the management of a receiver, continues to suffer as expenses go unpaid.

**Rialto's Interference with a Refinancing**

52.     After Rialto refused to reinstate the Loan, Borrower and Guarantors sought a lender willing to refinance the Loan.  On April 1, 2022, Borrower and Guarantors entered into a Letter of Intent with New Lender A.

53.     To underwrite the Loan, New Lender A requested a loan payoff amount from Rialto.

54.     Upon information and belief, to date, Rialto never responded to New Lender A's request for a payoff statement.

55.     In addition to Rialto's wrongful refusal to answer New Lender A's inquiries, Borrower and Guarantors have repeatedly requested that Rialto provide a loan payoff statement that only reflects default interest accruing after April 1, 2020.  Rialto has refused to produce such an accounting, and continues to insist on default interest from September 30, 2018.  As set out herein, Rialto may lawfully only claim default interest following a default in payment on the Loan, and not based on non-monetary defaults.

56.     At all times, Rialto was aware of Borrower's and Guarantors' efforts to refinance the Loan, including the ongoing negotiations and Letter of Intent with New Lender A.  Upon information and belief, Rialto refused to provide the payoff statement to New Lender A in order to injure Borrower and Guarantors, and to derail their efforts to enter into a business relationship with New Lender A.

57.     In addition, Rialto took other actions that complicated and ultimately derailed Guarantors' efforts to enter into a business relationship with New Lender A.  Among other things, Rialto initiated the Foreclosure Action after wrongfully refusing to negotiate with

Guarantors. Rialto also refused to release funds sufficient to make regular course payments with respect to the Hotel, including the ground lease payments due to the State of Hawaii.

58.     As a direct result of Rialto's actions, Borrower and Guarantors were unable to consummate the loan and associated documents, including a loan guaranty, with New Lender A.

59.     After the New Lender A refinancing fell through, Guarantors sought refinancing from numerous other firms. With market conditions deteriorating and interest rates increasing, however, the loan terms available from new refinancing partners are materially worse than Guarantors' agreement with New Lender A, with respect to interest rates and otherwise. Stated plainly, if Borrower and Guarantors refinance the Loan now, they will pay more than $2 million more per year than had Rialto not wrongfully interfered with the loan from New Lender A.

**Rialto's Interference with Guarantors' Other Projects**

60.     In 2020, Guarantors submitted a response to a public request for proposals from the Hawaii State Department of Land and Natural Resources ("DLNR") which sought applicants to redevelop two parcels of land adjacent to the Hotel. Given Guarantors' involvement in the neighboring property, Guarantors were well-positioned to redevelop and manage these properties.

61.     In July 2021, days before Rialto sent its July 23 Acceleration Letter, DLNR publicly announced that Guarantors and their company had been chosen to redevelop and manage both parcels of land adjacent to the Hotel, pending a final binding vote of the relevant DLNR committee.

62.     DLNR withdrew its preliminary approval of Guarantors' redevelopment proposal, however, due to concerns about cash flows for Guarantors and their affiliates, all of which were caused by Rialto's filing of the Foreclosure Action.

63.     Rialto sought to control all revenues from the Hotel, foreclose on the Hotel, and exercise other remedies under the loan documents in order to compel Borrower and Guarantors to acquiesce to their demand for unlawful and excessive default interest and other fees.   And, in doing so, Rialto interfered with and prevented the consummation of Guarantors' development agreement with DLNR.

64.     As a result of Rialto's interference with Guarantors' relationship with DLNR, Guarantors have been denied millions of dollars in management and development fees.  In addition, since the parcels directly adjacent to the Hotel remain undeveloped, Rialto's interference has directly led to a diminution in value of the Hotel itself.

**Rialto Files Suit Against Guarantors**

65.     To coerce Guarantors to pay Rialto's unlawful demands for default interest, Rialto filed suit against Guarantors to pay certain "Guaranteed Obligations" for which Borrower is allegedly personally liable to Lender.  No such "Guaranteed Obligations" exist.

66.      "Guaranteed Obligations" are defined as "obligations and liabilities of Borrower for which Borrower shall be personally liable pursuant to Article 13 of the Loan Agreement." Article 13 of the Loan Agreement provides that while Lender is typically limited to recovering any amounts owed on the Loan from the Hotel, Borrower may be personally liable for losses to the Lender under certain enumerated circumstances.

67.     The Guaranty Complaint asserts Guaranteed Obligations resulting from: (i) the supposed misappropriation or misapplication by Borrower of Rents from the Property (Loan Agreement § 13.1(a)(iv)), (ii) supposed fees or commissions paid by Borrower to its affiliates (Loan Agreement § 13.1(a)(viii)), and (iii) supposed fraud or intentional misrepresentation of a material fact in connection with the Loan (Loan Agreement § 13.1(a)(i)).

68. None of the Guaranteed Obligations claimed in Rialto's complaint are legitimate or asserted in good faith. The funds supposedly "misappropriated" by Borrower remain in accounts controlled by Borrower (or were already used to repay the Loan). The amounts supposedly paid by Borrower to alleged affiliates were bona fide management fees paid to non-affiliated third parties or were transfers permitted under the loan documents. And neither Borrower nor Guarantors have made any fraudulent or intentional misrepresentations regarding the Loan.

69. Guarantors have been forced to defend against Rialto's bad faith attempt to enforce the Guaranteed Obligations that Rialto knows or should know are not legitimate and that would have been extinguished, in any event, had Rialto permitted Borrower to repay its debt.

## FIRST CAUSE OF ACTION

### Breach of Contract Against Rialto

70. Guarantors incorporate by reference and re-allege paragraphs 1 through 64 as if repeated herein.

71. The Guaranty Agreement is a valid contract between Lender and Guarantors. Rialto has been authorized, pursuant to a power of attorney permitting Rialto to take any and all actions in respect of the Loan, to enforce the Guaranty Agreement as Lender's agent.

72. Rialto is in the functional equivalent of privity with Guarantors based on its relationship with Guarantors, its authority to act as the lender for the Loan, and its actual conduct in connection with the Loan.

73. Pursuant to the Guaranty Agreement, Guarantors guaranteed Lender payment of the "Guaranteed Obligations," and only the "Guaranteed Obligations."

74. Rialto breached the Guaranty Agreement by seeking to collect amounts that Rialto knows, or should know, are not Guaranteed Obligations.

75. Rialto's breach of the Guaranty Agreement has damaged Guarantors by causing harm to Guarantors' reputation, existing business relationships, and future business prospects.

**SECOND CAUSE OF ACTION**

**Breach of the Covenant of Good Faith and Fair Dealing Against Rialto**

76. Guarantors incorporate by reference and re-allege paragraphs 1 through 69 as if repeated herein.

77. The Guaranty Agreement is a valid contract between Lender and Guarantors.

78. Rialto has been authorized, pursuant to a power of attorney permitting Rialto to take any and all actions in respect of the Loan, to enforce the Guaranty Agreement as Lender's agent.

79. Rialto is in the functional equivalent of privity with Guarantors based on its relationship with Guarantors, its authority to act as the lender for the Loan, and its actual conduct in connection with the Loan.

80. The covenant of good faith and fair dealing implicit in every contract dictates that each party to a contract must refrain from arbitrary or unreasonable conduct that allows the party to realize gains that the contract implicitly denies, or prevents the other party from receiving the fruits of its bargain. The implied covenant also requires a party to a contract to exercise discretion under the contract in good faith.

81. Rialto abused its discretion under the Guaranty Agreement, and exceeded the limits of its authority as an agent for the Lender, by pursuing fictitious Guaranteed Obligations, and amounts in excess of the "Debt" defined in the Guaranty Agreement, for the purpose of

coercing Guarantors to pay default interest for the personal benefit of Rialto and its collaborators. Rialto has further abused its discretion under Paragraph 6 of the Guaranty Agreement by seeking costs and expenses for Lender's enforcement of the Guaranty, when in fact Rialto is enforcing the Guaranty for its own benefit. Rialto has further abused its discretion under Paragraph 7 by applying moneys available to pay the Loan in the Cash Management Account for the benefit of Rialto, not the Lender, and at the expense of Guarantors.

82.     Rialto's actions have also denied Guarantors the benefit of their bargain under the Guaranty Agreement, in which Guarantors agreed to guarantee the Guaranteed Obligations in exchange for Lender making the Loan to Borrower. Borrower stands ready, willing, and able to repay all legitimate obligations and liabilities on the Loan in full, relieving Guarantors of their obligations under the Guaranty Agreement. Yet Rialto's self-interested actions have prevented Borrower from satisfying their obligations and liabilities, artificially preserving the Guaranty Agreement and depriving Guarantors of the fruits of their bargain.

83.     Rialto's actions set forth herein violate the implied covenant of good faith and fair dealing in the Guaranty Agreement.

84.     Rialto's breaches of the covenant of good faith and fair dealing have damaged Guarantors by causing harm to Guarantors' reputation, existing business relationships, and future business prospects.

## THIRD CAUSE OF ACTION

### Tortious Interference with Prospective Contractual Relations Against Rialto

85.     Guarantors incorporate by reference and re-allege paragraphs 1 through 76 as if repeated herein.

86.    Guarantors entered into a Letter of Intent with New Lender A and proceeded to customary loan diligence and negotiation of the Loan Agreement. As part of the anticipated transaction with New Lender A, Guarantors intended to guarantee a new loan from New Lender A.

87.    Rialto was aware of Guarantors' refinancing efforts and prospective contractual relations with New Lender A.

88.    Without any legal basis, acting only in its own self-interest and in the interest of its collaborators, and without authority under any contract or servicing agreement, Rialto intentionally interfered with Guarantors' refinancing efforts by wrongfully demanding more than $4 million default interest. In particular, when Borrower requested an accurate payoff statement for the Loan, Rialto provided a fraudulent payoff statement that misrepresented amounts owed by including default interest accruing from a purported non-monetary default, in violation of the relevant contracts.

89.    New Lender A directly sought from Rialto an appropriate, lawful, and necessary payoff statement. Rialto wrongly refused to provide one at all.

90.    Rialto's refusal to provide a lawful payoff statement caused New Lender A to abandon the refinancing. In addition to its wrongful refusal, Rialto has taken additional actions, including its preemptory and bad faith filing of the Foreclosure Action, its failure to release funds to pay regular course expenses, and its filing of this action, not in a bona fide effort to collect on the Loan, but instead to harass and prejudice Guarantors and prevent them from consummating a new business deal and refinancing.

91.     Due to deteriorating market conditions, the interest Guarantors will pay as part of any future refinancing will be substantially higher (approximately $2 million annually as of today).

92.     But for Rialto's wrongful refusal to provide an accurate and legitimate payoff statement, Guarantors would have consummated the Loan refinancing as planned and entered into a new Guaranty Agreement with New Lender A.

93.     Rialto interfered with Guarantors' relationship with New Lender A by employing unfair and dishonest means and by applying undue economic pressure, including, among other things, by refusing to provide an accurate and legitimate payoff statement when requested, by demanding payment of default interest above that permitted by the loan documents, and by refusing to release cash to pay the normal course expenses of the Hotel, leading to needless financial distress and difficulties.

94.     As a result of this interference, Guarantors have been damaged in an amount to be proven at trial sufficient to compensate them for the additional costs and liability under the Guaranty Agreement that would not have been imposed but for the interference and for lost business opportunities and reputational harm as a result of the failed refinancing.

## PRAYER FOR RELIEF

WHEREFORE, Guarantors respectfully request that the Court enter judgment against Rialto for the following relief:

(i)     An award of damages against Rialto in an amount to be determined at trial;

(ii)    Costs, interest, expenses, and attorneys' fees; and

(iii)     Such other and further monetary, equitable, and injunctive relief as this

Court deems just and proper.

Dated: New York, New York          Respectfully submitted,
         February 10, 2023

                                   **KASOWITZ BENSON TORRES LLP**

                                   By:     /s/ *Michael A. Hanin*
                                           Michael A. Hanin
                                           Edward E. Filusch
                                           Jill L. Forster
                                           Andrew W. Breland
                                           1633 Broadway
                                           New York, New York 10019
                                           Telephone: (212) 506-1700
                                           Facsimile: (212) 506-1800

                                           *Attorneys for Defendants Edward Bushor and*
                                           *Stuart L. Miller*